IN THE

# SUPREME COURT, OF JUDICATURE

OF THE

# STATE OF NEW JERSEY.

## NOVEMBER TERM, 1878.

---

## CAROLINE ELY MAXWELL ET AL. v. SARAH G. GOET SCHIUS ET AL.

1. An act of the legislature purporting to validate a sale made on partition proceedings by commissioners in a court having no jurisdiction either over the property or the owners, is nugatory, and such sale is void.
2. The general rule is that the legislature of this state cannot legalize any judicial act that is void for want of jurisdiction.
3. On proceedings for partition by the tenants of the life estate, the remainder was ordered to be sold, said sale being prior to the act authorizing the sale of remainders—*Held*, the sale was void, and could not be made valid by subsequent legislative action.

---

In ejectment. Both parties claim under Thomas Stevenson, deceased, who died on the 8th of September, 1824. By his will he devised to his daughter, Agnes Maxwell, " the interest and income of one-fifth part (first deducting $1200 advanced) during the term of her natural life. After the decease of Agnes, the one-fifth (first deducting the advance) to all the children of my said daughter Agnes in fee."

The plaintiffs are Agnes Maxwell's children.

In similar terms the testator gave an equal one-fifth part of his estate to his son Thomas for life, with a remainder to his children in fee. And to his son Hay, his daughter Maria, and his son John, he devised to each an equal fifth part in fee.

The testator's widow died in 1830.

Agnes Maxwell, the devisee for life, was married at the date of the will, and remained in coverture till her death, April 27th, 1866. Her husband died in 1872.

Of the plaintiffs, Ann Eliza Maxwell is a daughter of Agnes Maxwell, was an infant about fifteen years old, at the date of the sale hereinafter mentioned. Hugh, another of the plaintiffs, was also an infant, at the time of such sale; and Agnes Upshur, another daughter of plaintiff, was then unborn.

In the year 1832 the grantees of Hay Stevenson applied to three judges of the Court of Common Pleas of Bergen county to partition Thomas Stevenson's estate into five parts. Commissioners having been duly appointed upon the statutory notice, and having reported that a partition could not be made, &c., the three judges, on May 2d, 1832, directed the commissioners to sell. This sale was made, and duly reported to the Court of Common Pleas of Bergen county, by which court it was confirmed and a conveyance directed.

The defendants claim, derivitavely, under this title.

At the time of this sale and conveyance, two of the devisees for life under the will of Thomas Stevenson, viz., Thomas Stevenson and Agnes Maxwell, were living.

Agnes Maxwell's children were then all infants, except Agnes Upshur, who was then unborn.

Argued at June Term, 1878, before BEASLEY, CHIEF JUSTICE, and Justices SCUDDER and KNAPP.

For the plaintiffs, Robert Gilchrist.

For the defendants, I. W. Scudder and J. B. Vredenburgh.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. In the year 1833, it was de-
cided in this court, in the case of *Stevens* v. *Enders*, reported
in 1 *Green* 271, that, with respect to estates in remainder,
" the judges of the Common Pleas have no authority to make
an order of sale, nor to approve of and confirm it, and the
commissioners have no authority to make a sale and convey-
ance." By force of this decision, if the case were unaffected
by any other condition, the plaintiffs' title would prevail, for
they are remaindermen, and their title would not be divested
by the sale made in the proceedings in partition which took
place in the year 1832. This position is not controverted by
the counsel of the defendants, who fully admit the destructive
effect upon the rights of their clients of the adjudication just
referred to, and contend that such ineffectual title was made
good by the act of the legislature passed 14th March, 1861.
*Pamph. L.* 434. This act reads as follows, viz. : "That
any partition of lands heretofore made or hereafter to be
made, upon application by any co-parcener, joint tenant or
tenant in common therein, to any court, judge, judges, or
other officers having jurisdiction in matters of partition in
which process has been served, or notice given in the manner
required by law, and any sale of lands by virtue of an order
therefor, made in any such proceeding for partition, shall be
binding and conclusive upon all co-parceners, joint tenants,
or tenants in common ; and all persons claiming, or to claim
any interest in any share in said lands, in reversion or re-
mainder, notwithstanding any error or illegality in such pro-
ceeding for partition or sale, unless such proceeding shall have
been reversed or set aside on *certiorari*, writ of error, or other
proceeding, to review the same, brought within three years
after such partition or sale."

This is a remedial statute, its purpose being to give security
to titles derived from proceedings by partition, the means
employed being to make such proceedings conclusive, not
only upon persons having an estate in possession, but also
upon those entitled in reversion or remainder, in all cases

where the application has been made to officers " having juris-
diction in matters of partition in which process has been
served or notice given in the manner required by law." This
act is made by its terms retrospective, and, it seems to me, is
plainly applicable to the proceedings in partition from which
the title of the defendants proceeds ; and, consequently, the
sole question for consideration is, whether such act, in its ap-
plication to a case like the present one, is valid and effectual.

The subject thus presented is discussed with signal learning
and ability in the brief of the counsel of the plaintiffs, the
fundamental ground of such discussion being the position
that the proceedings in partition in question were an absolute
nullity, and that, consequently, it was beyond the legislative
ability to validate them. The premise of this argument I
certainly think is well warranted by the facts. It seems to
me clear that, by force of the decision in the case of Stevens v.
Enders, it must be concluded that the sale on which the de-
fendants rely, was, in itself, utterly null and void. The
judges of the Pleas ordering the sale, and the Court of
Common Pleas confirming it, had jurisdiction, with respect to
the estate in remainder, neither over the subject matter ad-
judged, nor over the persons in interest. According to the
judgment pronounced in this court, a partition proceeding by
force of the laws then in existence, related only to the estates
of parties entitled to a present possession, and did not in any
wise relate to interests in remainder ; and the consequence is,
when the judges and the court laid their hands on this remain-
der, and ordered the sale made and confirmed, such proceed-
ing, being *coram non judice*, was an act destitute of any legal
value. Nor were the remaindermen either summoned or
present, in contemplation of law. The statutory notice was
given, but it was a notice to persons interested in the partition,
and remaindermen, by force of the decision just cited, were
not such. Such remaindermen, even if they had become
advised of what was occurring, could not have intervened, for,
not being concerned, they would not have been entitled to be
heard. A clear case is presented, then, of a tribunal attempting

to exercise an authority over a person not before it, and over a subject not liable to its control.   The sale made in this case was, in my judgment, as void as though it had been ordered and confirmed by a justice of the peace.   I assume, therefore, as true, the premise of the learned counsel in all its force.

The only point of difficulty in the case is with respect to the conclusion from the foregoing datum, that this sale, though admittedly void, could not be made valid by the act of legislation just quoted.

If this statute had been passed prior to the constitution of this state, adopted in the year 1844, it is obvious that a very different subject of inquiry from the one now before the court, would have been presented, for I know of few things more uncertain than the boundaries of the legislative power under the original charter by force of which this government was organized.   This latter instrument does not in any wise define or restrict the power of the law makers ; nor does such provision appear either in the instructions of Queen Anne to Lord Cornbury, on the surrender of the government of the proprietors, nor in the letters-patent from King Charles to the Duke of York, except that in the latter, in conferring power to " make, ordain, and establish all manner of orders, laws, directions, instructions, forms, and ceremonies of government and magistracy fit and necessary," the limitation is enjoined, " so also that the same be not contrary to the laws and statutes of this our realm of England, but as near as may be agreeable thereunto."   Looking at this untrammeled authority, and at its earliest manifestations in forms of government, it is evident that our earliest legislature was a copy, as near as may be, both in structure and function, of the English parliament; and there seems no reason for believing that it did not claim all the powers of its illustrious prototype.   The parliament of England was not invested merely with authority to legislate ; but its function was composite, partly legislative, partly administrative, and partly judicial ; and it was this body that was imitated in the establishment of the legislature in this state.   So our courts were instituted after the same fashion ;

so that, if a question of legislative or judicial prerogative arose, there was no criterion except the parliamentary rolls, in the one case, or the practice of Westminster Hall in the other. It has been often said, and, with certain necessary reservations, said with truth, that parliament is omnipotent; and I do not know on what ground it would be that such an amplitude of power could have been denied, to belong to the legislative department of this government, as it was primarily organized. Manifestly it exercised, without challenge, a judicial function in granting divorces; and an examination of Allinson's laws will show that it took upon itself to deal, by means of special laws, with the rights of property in a mode that is quite incompatible with the theory that it was possessed of no prerogative but that of legislation. It is true that, according to this body, all the power thus claimed for it, there is just reason for the opinion that there were certain bounds that it could not overstep, for there are some rights so fundamental, that the existence of any power in the body politic which in its legitimate exercise would be capable of destroying them, would be fatal to the very purpose and end for which all rational government is established. Thus it has frequently, in speculation at least, been predicated of the parliament of England, that it had not the competency of making a man a judge in his own case, and in like manner of many of the governments in this country, that they could not, by an edict, take the property of one citizen, and, without compensation or just cause, vest it in another; but, irrespective of such fundamentals as these, it is, it seems to me, altogether impossible to lay the line beyond which the legislative power in question was forbidden to go. I have failed to find, therefore, either in the constitution of the legislature of this state in its ancient form, or in its history, anything that would lead me to the conclusion that it was not possessed of an ability to enact such a statute as this now challenged. And it appears to me that it is substantially upon this ground that the decision in the case of *Wilkinson* v. *Leland*, 2 *Peters* 627, and other cases of the same strain, are to be justified. That was a case of a will

proved in New Hampshire, and an order made in that state for a sale of lands to pay debts, and under such order the executor sold lands situated in Rhode Island. This latter sale being void, was confirmed by an act of the legislature of Rhode Island, and this confirmation was held valid. The conclusion of the court was derived from the considerations that the sale had been made in good faith, for the payment of debts; that the devisee whose rights were divested had taken the estate subject to such debts, and that the court was not prepared to say "that in a state *not having a written constitution*, acts of legislation having a retrospective operation, are void as to all persons not assenting thereto, even though they may be for beneficial purposes, and to enforce existing rights." It may well be that, antecedently to the constitution of 1844, an act such as appeared in the reported case, could have been legitimately enacted by the legislature of this state, but the question now remains for discussion whether, since that epoch, such legislation, by force of existing institutions, is to be sanctioned.

It has already been said that the sale of the remainder now in question was wholly void. That sale took place in the year 1832, and from that time to the passage of the act of 1861, the title to this property was vested in these remaindermen. This was the effect, not of the absence of any formal observance, or of the presence of irregularity in the proceeding, but of the absence of any right to interfere at all with the interests of these persons. It was not the case of a conveyance made by the owner of the land, and the defeat of such intention by the non-observance of a form : legitimate legislation has removed such impediment; but it was a case of a sale made by unauthorized persons without the assent of the owner, express or implied. As the sale was made under the authority of officers having jurisdiction neither over the subject nor over the person, it was an act that the legislature could not, antecedently, have authorized to be done. I cannot differ this case in any degree from what it would be if this sale of this remainder had been made by a person who pos-

sessed no official character : the question is the same as if the father of these remaindermen had, deeming it for their interest, converted their property into money. Could the legislature have validated such a transaction? It will be observed, if this can be done, it is the act of legislation alone that is operative ; the sale under the partition being wholly void, has no effect whatever, and in this respect this case is totally unlike that class of cases recognized in the decisions where warranted proceedings have failed from irregularities or defects of form, and where, by the legislative removal of such defects, the proceedings have become complete. In the present case, the statutory act must have the creative effect of originating the title. Is such an exertion of the legislative power legitimate in this state ?

By the constitution of 1844, it is provided that " the powers of the government shall be divided into three distinct departments—the legislative, executive, and judicial ; and no person or persons belonging to, or constituting one of these departments, shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided." So far as legislative judicature is concerned, it is expressly put an end to by this provision ; and after this plain circumscription of its sphere of action, there can be no pretence for a claim that the legislature can exercise any judicial function whatsoever, except such as is, in terms, allowed to it in the constitution itself. Not content with a distribution of the powers of government to the three departments, there is superadded a prohibition against either infringing on the others, a circumstance bearing the semblance of an admonition to guard against such a perversion. Since this explicit marking out of the several departments, it has been the general opinion, so far as I can learn, that the legislative power is the only power vested in the legislature. Such appears to be the view expressed in *Colgan* v. *McKeon,* 4 *Zab.* 566 ;. *State, Winans, pros.,* v. *Crane, Collector,* 7 *Vroom* 394 ; *State* v. *Newark,* 3 *Dutcher* 185.

The power of the legislature being, then, thus limited to

Maxwell v. Goetschius.

this single field of action, how is the enactment of the present law to be vindicated? If it has the effect intended, it takes this vested estate out of these remaindermen and converts it into money. The question whether the owner's land shall, without his assent, be turned into money, has always at the common law and in this state been deemed one addressed to judicial discretion. The right to decide in such junctures has been always confided, in part, to courts of equity. Even where such sale has taken place in this state in a course of law for the partition of lands, the parties interested have been entitled to notice, and the proceedings have ever been under the control of the courts. It has been ever so. If land can be sold by persons without authority, and without a hearing, or an opportunity of a hearing being given to the owner, and such sale made valid by a legislative act, I am at a loss to conceive what force is to be accorded to that clause in the constitutional bill of privileges which declares that, among the inalienable privileges of men, shall be that of " possessing and protecting property." I understand by this that the property and rights of every man are put under judicial protection, so that he cannot be deprived of them except by the law of the land, and by the law of the land, I understand something very different from the act of officers without jurisdiction, in conjunction with a legislative confirmation. I have concluded that the statute in question has no legal basis.

And this result, I think, is in agreement with authorities of the greatest weight. Such decisions must be carefully distinguished from many others, which have arisen out of a state of facts in some respects similar to that now under consideration, but which differs in other important particulars. Such are cases exhibiting legislative acts, curing mere irregularities in the proceedings of bodies duly authorized, as in the case of the *State* v. *Town of Union*, 4 *Vroom* 355. As to *Snowhill* v. *Snowhill*, 2 *Green's Ch.* 20, and *Kearney* v. *Taylor*, 15 *How.* 515, they were both controlled by the old constitution of the state, and the act validated in the latter case did nothing more than correct an error in a legitimate procedure.

But aside from such illustrations of the rule applicable to such junctures as these, stands the case of a legislative act intended to give life to a proceeding void, not because of an error of form, but from want of jurisdiction in the adjudging tribunal. With regard to this class, Judge Cooley, in his valuable work on Constitutional Limitations, page 107, says justly: ".But it would not be competent for the legislature to authorize a court to proceed and adjudicate upon the rights of the parties, without giving them an opportunity to be heard before it; and, for the same reason, it would be incompetent for it, by retrospective legislation, to make valid proceedings which had been had in the courts, but which were void for want of jurisdiction over the parties." An examination of the authorities cited for this proposition by this learned writer, will satisfactorily show that this statement in the text is fully warranted by the decisions of courts of the highest standing. In Pennsylvania (*Richards* v. *Rote,* 68 *Pa. St.* 248,) the question arose in a case of the general nature of the one under adjudication. It was a proceeding for partition, and the notice required by the statute had been served on a person who, it was supposed, was the guardian of one of the parties in interest, but it turned out that such supposition was ill-founded, and on that account the proceeding, so far as related to such party, was *coram non judice.* A statute was passed to legalize this extra-judicial action, and the court held such act unconstitutional. The language used by the court is emphatic in its repudiation of this class of laws: " What is this," it is asked, " but a mere bald attempt to take the property of A and give it to B ? At the date of the passage of the act, Lewis Richards had an undivided share—a fourth part of the land in question—and by the legislative fiat validating these proceedings in partition, which the law then pronounced a nullity as far as his estate was concerned, this undivided share is divested from Lewis Richards and vested in Griffin Rote." In a subsequent part of the opinion the distinction is drawn between a statute to supply formal omissions and remedy irregularities in the course

of a procedure authorized by law, and an attempt by the same method "to infuse life into that which is dead and to give effect to a mere nullity." In *McDaniel* v. *Correll*, 19 *Ill.* 226, a similar endeavor was made to validate a void proceeding by legislative enactment and the effort failed, as it did likewise in the Supreme Court of Wisconsin in the case of *Nelson* v. *Rountree*, 23 *Wis.* 368. The same subject received a careful examination by the Supreme Court of Massachusetts, in *Denny* v. *Mattoon*, 2 *Allen* 361, and the alleged right of the legislature to vitalize a judicial act that was void, was utterly disallowed. This was a proceeding in insolvency, commenced by a petition of creditors before a person claiming to act as a judge of insolvency, but who had no title to such office, and the legislature had passed an act legalizing such proceeding. With regard to this point, this is the language of the court: "To say that a man's property may be taken from him by force of an act of legislation, which attempts to confirm and give validity to proceedings which have previously been adjudged void for want of authority and jurisdiction, is only to affirm that he may be deprived of his estate without due process of law." A similar constitutional construction is approved of in the following authorities: *Powers* v. *Bergen*, 6 *N. Y.* 358; *Jones' Heirs* v. *Perry*, 10 *Yerger* 59; *Shonk* v. *Brown*, 61 *Penn.* 320.

I have examined carefully the cases cited in the brief of the counsel of the defendants, and do not think any of them in point, proceeding, as the decisions do, on grounds not applicable to the present case. Nor do I think much stress can be laid in favor of the defence on the case of *Young* v. *Rathbone*, 1 *C. E. Green* 227. It is true that it appears from the files of the court, that the validity of this act of 1861 was drawn in question by the answer—but it is also true, that such issue received no attention from the counsel on the argument, nor by the court in its disposition of the case. It is obvious that the case of the complainant failed unless he could succeed in breaking down the judgment in Stevens *v.* Ender, and all the efforts of his learned counsel were directed to that end, for

failing in this, the time that had elapsed in tendering title was a plain bar to his success. This was the view, I think it is manifest, of the counsel on both sides, and it was certainly, as appears by the opinion, the view of the Chancellor himself. The act in question is referred to by him as valid, because his attention was not called to its defect, and because it was, whether valid or not, of no consequence in the light in which he looked at the matter before him, for I feel entirely certain that if the constitutionality of this law had been ventilated on the occasion in question, that so weighty a matter would not have been passed by in silence by the distinguished judge who then presided in that tribunal, and who was so eminently fitted, by his great ability, learning and experience, to deal with questions involving important legal principles in their application to the fundamental law of the state.

In conclusion, I remark that if there are any equities that favor the defence in this case, and which qualify the rigor of the legal rule as above expounded, this is not the tribunal in which they can be asserted or enforced. Upon the facts presented in the record the plaintiffs are entitled to judgment.