THE SINGER COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. LARRY K. GARDNER, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued June 4, 1974—Decided July 30, 1974.

404

*Mr. Dickinson R. Debevoise* argued the cause for plaintiff-appellant and cross-respondent (*Messrs. Riker, Danzig, Scherer & Brown,* attorneys; *Mr. James S. Rothschild, Jr.,* on the brief).

*Mr. David A. Kasen* argued the cause for defendant-respondent and cross-appellant.

The opinion of the Court was delivered by

CLIFFORD, J. In this replevin action the district court entered judgment dismissing the complaint and dismissing the counterclaim for damages. Plaintiff appealed to the Appellate Division and defendant filed a cross-appeal. Before argument in the Appellate Division we certified on our own motion, *R.* 2:12–1.

The nature of the action, the contentions of the parties, and the basic facts are set forth in the opinion of the district court, 121 *N. J. Super.* 261, 262–266 (1972), as follows:

This is an action in replevin in which plaintiff The Singer Company seeks judgment for possession of certain articles of merchandise sold to defendant, and by way of damages, the balance of the purchase price of said articles allegedly remaining due and unpaid. Defendant denies any indebtedness to plaintiff. He contends that the agreement between him and plaintiff be declared void as unconscionable and by reason of the exaction of wrongful charges by plaintiff in violation of the Retail Instalment Sales Act, *N. J. S. A.* 17:16C–1 *et seq.* By way of counterclaim defendant demands damages for the alleged wrongful seizure by plaintiff of the goods in question.

On January 15, 1969 defendant purchased from plaintiff a sewing machine for the agreed purchase price of $400. He paid $65 down on account of the purchase price with the balance to be paid in instalments. A sales slip was prepared setting forth the sale, the price (plus sales tax of $12), the down-payment, the balance of $347 remaining due, and showing the "agreed monthly payment" as $14.

On January 21, 1969 defendant signed a "Singer Credit Application" setting forth on the face thereof personal data usually called for on such applications. On the reverse of said application form there appears in reasonably legible type an agreement headed "The Singer One to Thirty-six Credit Plan Agreement." This agreement sets forth the terms of instalment payments made on this so-called "credit plan."

On or about February 8, 1969 defendant purchased a Singer U–43 vacuum cleaner for the sum of $70. The sales slip covering the transaction indicates a payment of $2.10 on account (the amount of the sales tax), a balance due of $70 and agreed monthly payments of $15.

On May 21, 1969 defendant purchased two more vacuum cleaners, a U–43 model for $69.95 and a C–10 model for $79.95, a total pur-

chase price of $149.90. This sales slip showed payment of $4.50 (the amount of the sales tax), the balance of $149.90, and no amount of agreed monthly payments.

Defendant made monthly payments on account of these purchases until July 1969. Thereafter payments were made sporadically until April 24, 1971, when a payment of $100 was made, bringing the amount paid on account to a total of $469. No payments on account were made thereafter. Certain attempts at collection by representatives of plaintiff having been unsuccessful, this action in replevin was instituted by the filing of the complaint on July 13, 1971. A writ of replevin was issued and there were seized thereunder the sewing machine and two vacuum cleaners. No notice of the repossession was given to defendant.

The sewing machine was resold by the plaintiff on April 4, 1972 for $172.95. One U–43 vacuum cleaner was resold on May 27, 1972 for $7.99. No notice was given to defendant of the resales and it is to be noted that such sales were prior to the entry of any judgment in this action. There is no evidence as to whether the resale prices represented the then fair market value of the goods sold. In any event, defendant was credited with the sum of $180.94 realized from the repossession sales. Plaintiff has thus credited defendant with payments totalling $469.60 and proceeds of resale in the sum of $180.94, making total credits of $650.64. The other vacuum cleaner seized under the writ of replevin has not been sold and nothing is credited to defendant by reason of its repossession.

It is to be noted that while the complaint alleges sale of two vacuum cleaners to defendant, the evidence and testimony disclose the sale of three vacuum cleaners, one February 8, 1969 and two on May 21, 1969. Defendant testified that he paid cash in full for the vacuum cleaner purchased in February. The records produced by plaintiff indicate no such payment. Defendant says he was given a receipt for the purchase. He did not produce such receipt, saying he gave it to his mother in Philadelphia for whom he bought the machine. I conclude that the sale in question was not a cash sale as contended by defendant. Defendant claims that he made certain payments with which he was not credited. I find that such payments are not established and I conclude that the charges and credits as stated by plaintiff must be accepted as correct.

Plaintiff's claim against defendant, then, is summarized as follows:

*Total Charges.*

| | | |
|---|---|---|
| Purchases | $619.60 | |
| Sales taxes | 18.60 | |
| Service charges | 228.87 | |
| (time-price differential) | | |
| Credit life insurance | 3.27 | $870.64 |

| | | |
|---|---|---|
| Total Credits. | | |
| Payments | $469.60 | |
| Proceeds from repossession sales | 180.94 | 650.54 |
| | | |
| Total Due | | $220.10 |

Defendant contends that the transactions were retail instalment sales, and fall within the provisions of the Retail Instalment Sales Act, *N. J. S. A.* 17:16C–1 *et seq.* He contends that plaintiff violated the provisions of the act in that:

(1) The contract failed to set forth the particulars required by *N. J. S. A.* 17:16C–27.

(2) The effective interest, or time-price differential, amounts to an annual rate of 18%, although such interest or time-price differential is limited by the act to 10%, *N. J. S. A.* 17:16C–41.

(3) Particulars as to separate items were not set forth in additional statements annexed to the contract, as required by *N. J. S. A.* 17:16C–28.

(4) Defendant was not informed as to allocation of payments or balances due on individual items, as required by *N. J. S. A.* 17:16C–29.

· Defendant therefore urges that the contract be held unconscionable and void, and thus unenforceable under *N. J. S.* 12A:2–302.

Plaintiff concedes that the provisions of the Retail Instalment Sales Act, including the limitation of 10% on the time-price differential, have not been complied with. It contends, however, that these transactions are not retail instalment sales but are "retail charge account" sales, and do not come within the provisions of the act. The principal issue in this case is whether the transactions are retail instalment sales subject to the provisions of *N. J. S. A.* 17:16C–1 *et seq.*

Defendant also contends that the seizure of the goods by plaintiff under the writ of replevin was wrongful since it was made without notice or an opportunity by defendant to be heard, and that the replevin statute is unconstitutional. *Cf. Fuentes v. Slevin*, 407 *U. S.* 67, 92 *S. Ct.* 1983, 32 L. Ed. 2d 556 (1972).[1]

The county district court concluded that (1) the Singer Company's time sales agreement was an installment contract covered by the pre-1971 Retail Installment Sales Act, *N. J. S. A.* 17:16C–1 *et seq.*, rather than a revolving charge ac-

---

[1] This recitation mistakenly indicates, in the first sentence, that plaintiff sought both judgment for possession and damages. The prayer for relief was pleaded in the alternative, plaintiff seeking either possession or damages.

count outside the Act's ambit, and (2) that agreement was unconscionable under the rationale of *Williams v. Walker-Thomas Furniture Co.,* 121 U. S. App. D. C. 315, 350 *F.* 2d 445 (D. C. Cir. 1965) because it was a cross-collateral security arrangement. We are of the view that these conclusions are predicated upon a misinterpretation of two distinct areas of the law. We hold that the agreement in question was neither encompassed by the Retail Installment Sales Act nor unconscionable. Accordingly, we reverse and uphold the plaintiff's position.

I

Defendant argued that Singer's "One to Thirty-Six Month Plan" violated the Retail Installment Sales Act as it existed before being amended in 1971, in that it failed to specify the time-price differential, time balance, and time sales price as required by *N. J. S. A.* 17:16C–27; it did not apportion each payment among the separate purchases in proportion to the cash prices of the items purchased, as required by *N. J. S. A.* 17:16C–29; it did not call for appropriate statements after each purchase, mandated by *N. J. S. A.* 17:16C–28; and its time-price differential amounted to more than 10% per year, the maximum permitted under *N. J. S. A.* 17:16C–41. With the exception of the last asserted violation,[2] plaintiff does not dispute that these provisions were not met. However, it contends that its "One to Thirty-Six Month Plan" was a revolving charge account and therefore not bound by the requirements of the Retail Installment Sales Act.

---

[2]The county district court concluded that "[t]he use of the device of a 'credit card' * * * enable[d] the seller to impose a time-price differential greater than that permitted by the act." 121 *N. J. Super.* at 269. However, mathematical analysis demonstrates that in fact the differential imposed by the Singer plan was less than permitted by the Act by twelve cents. Apparently, $10 per $100 per year is an effective approximate financial charge of 18% per year, or 1½% per month (The Singer Company charge) on a *declining* balance.

The court below apparently rejected this contention on two grounds. First, it considered the fact that the scheduled monthly payment does not decline with reduction of the unpaid balance necessarily means that the agreement is an installment sale.[3] Second, it believed that a security interest cannot attach to items purchased under a revolving charge account.[4] In reality, however, the key distinction between the two types of time sales depends upon the method of interest computation. The interest, and thus the time-price differential, *N. J. S. A.* 17:16C–1(*l*), on an installment sale can be pre-computed for the entire time span over which payments must be made. This sum is immutable and generally cannot be avoided or mitigated by prepayment of the principal.[5] A revolving charge account, on the other hand, allows planned payments to be pre-paid, with concurrent reduction in interest. The first thirty days are usually interest-free, and if the entire amount is paid within this time, no interest ever becomes due. Also, under the "open-ended" revolving charge plan purchases are made pursuant to one

---

[3]The clause in the Singer contract providing for a schedule of payments reads as follows:

My monthly payment will be the larger of: 1. The agreed monthly payment; or 2. the company's minimum monthly payment listed on the schedule of payments below. I will pay the amount due upon the receipt of each statement; however, if within 30 days from my billing date I pay the full amount shown on the statement, no time price differential or service charge on such amount will be charged on any subsequent statement. My scheduled monthly payment will not decline as my unpaid balance is reduced.

[4]The clause providing for retention of a security interest reads:

Title to the goods purchased hereunder shall remain in you [Singer] until the unpaid balance of each separate purchase is fully paid. I will not dispose of the goods or encumber them without your written consent, and will protect you against all loss or damages to the goods from the time they are delivered until I have fully paid for them.

[5]In New Jersey this feature has been modified by statute. *N. J. S. A.* 17:16C–43 provides that prepayment of principal reduces the total interest due according to a complex formula.

written agreement with the retailer under which the customer can make additional purchases from time to time. A new contract is required for each "close-ended" installment sale. The definitions of the two types of sales are commonly accepted and not a matter for debate. See, *e.g., Cecil v. Allied Stores Corp.,* 513 *P.* 2d 704, 711 (Mont. Sup. Ct. 1973); *Zachary v. R. H. Macy & Co.,* 31 *N. Y.* 2d 443, 340 N. Y. S. 2d 908, 293 *N. E.* 2d 80, 88 (Ct. App. 1972), reh. denied, 32 *N. Y.* 2d 705, 343 N. Y. S. 2d 1026, 296 *N. E.* 2d 459 (Ct. App. 1973); *Slate v. J. C. Penney Co.,* 48 *Wis.* 2d 125, 179 *N. W.* 2d 641, 642 (Sup. Ct. 1970).

Tested in the light of the above significant characteristics the Singer Company plan clearly created a revolving charge account. Although the minimum monthly payment required of Gardner each month was a standard $20, the amount of interest included in the twenty dollar payment decreased as the principal was paid off. Thus, for example, if his balance one month were $441.45, his next monthly payment (at the $1\frac{1}{2}\%$ monthly interest rate) would include $6.62 interest and $13.38 principal. The following month, on the remaining $428.07 principal, his twenty dollar payment would consist of $6.42 interest and $13.58 principal. The interest could not be calculated in advance because, although the minimum payment was standardized, Gardner did have an option of prepaying more than this, diminishing the amount of interest owed in succeeding months. It is not true, as the trial court's opinion states, that "the purchaser was given no option as to any method or plan of payment." 121 *N. J. Super.* at 269.

It is precisely because of this built-in flexibility that the Singer plan cannot be said to have conformed to the requirements of the Retail Installment Sales Act. Section 17:16C–27 requires that the time-price differential as well as the time balance and time sales price be set out in the retail installment contract. Likewise, section 17:16C–41 requires that the time-price differential be computed from the date of the contract to the date of the last installment. See

*Cecil v. Allied Stores Corp., supra,* 513 P. 2d at 711. Conformance to these standards would obliterate the advantages to the consumer inherent in the more flexible revolving charge account system.

Furthermore, the pre-1971 Act defined a retail installment contract as "any contract * * * to pay the retail purchase price * * * in *2 or more* installments over a period of time * * *." *N. J. S. A.* 17:16C–1(b) (emphasis added). Under the Singer plan, the full amount could have been paid within the first month in *one* installment. Again, conformance with this definition would have removed from the Singer Company plan that flexibility which is so advantageous to consumers.

It is also clear that the Singer plan was "open ended," another feature of revolving charge accounts. The customer could continue to purchase items on the one account without the necessity of applying for new credit on the occasion of each purchase. Gardner in fact took advantage of this feature to make several successive purchases, and therefore apparently did understand the nature of the plan for which he applied. This arrangement was to his benefit in supplying him with a ready and reliable credit source, in simplifying his record-keeping — this by combining a number of debts into one monthly statement — and in obviating the need for continual credit investigations, thereby keeping operating costs low, a benefit to both parties. Note, 54 *Marquette L. Rev.* 223, 228 (1971).

█ In holding that the Singer plan is an installment sale arrangement, the trial court mistakenly attached critical significance to the fact that a lien was retained by the Singer Company in the goods purchased by Gardner. However, no authority is cited in support of this proposition, nor does research disclose any. In fact, the existence of a security interest is wholly immaterial to classification of a credit plan as either an installment contract or a revolving charge account.

■ There is no reason why retention of a security interest should be permitted under one type of contract and prohibited under the other. Significantly, under the amended Retail Installment Sales Act retention of a security interest in goods sold through a charge account is permitted. Section 17:16C–30 of the amended Act provides: "Where title to or a lien upon goods sold by the retail seller is retained or taken by the retail seller the retail buyer may be required to insure the goods at the retail buyer's expense * * *." Since *N. J. S. A.* 17:16C–1 defines a "retail seller" in part as one who sells goods pursuant to a retail charge account, sellers who utilize revolving charge accounts thus may retain a lien. Note also that the proposed Uniform Consumer Credit Code § 3.301 authorizes retention of a security interest in such goods, as does the Federal Consumer Credit Protection Act, 15 *U. S. C.* § 1637(a)(7) (Supp. 1974). Likewise, some state statutes specifically refer to charge account security interests, *e. g.* Mass. Ann. Laws, ch. 140C § 6(a) (1972); Tex. Rev. Civ. Stat., art. 5069–6.01(g) (Vernon's Ann. 1971).

## II

We are further of the view that the court below was in error in holding that the credit plan here under consideration is unconscionable. As suggested above this plan is actually more beneficial to the consumer than would be an installment sale. Its advantages lie in its flexibility, with consequent possible reduction in interest, and in the availability of a continuing ready credit source. Nevertheless, the county district court held that the contract is unconscionable not only because of what it perceived to be lack of compliance with the Retail Installment Sales Act but also because of an apparent misconception as to the nature of the security interest retained by the Singer Company. By classifying the arrangement as a cross-collateral security agreement, the trial court sought to justify a finding of unconscion-

ability under the rationale of *Williams v. Walker-Thomas Furniture Co., supra.*

A cross-collateral security arrangement is one in which a seller retains a security interest in all goods sold to a purchaser until the whole balance has been paid off, no matter how much money has been paid or how long the arrangement lasts. Examining such a clause, the *Williams* court remanded the case for findings on the unconscionability issue, strongly intimating that it believed the clause in question to be unconscionable.[6] In so holding, the court relied heavily on the peculiar circumstances of the case. There, a welfare recipient had paid $1,400 over a period of several years, reducing her balance to $164. She then bought a stereo set on which she defaulted, and all items were reclaimed by the seller. Of particular interest to the *Williams* court was the disparity of bargaining power between the parties and the lack of understanding of the contract terms by the purchaser. The terms were hidden in a maze of fine print and the purchaser was induced to make the final purchase, which she did not need, by a "high pressure" salesman who knew she could not afford it.

Except for the trial court's decision in this case, no court since *Williams* has held cross-collateral security agreements unconscionable. Nor does the opinion of the court below suggest circumstances which would bring this case under the *Williams* rationale. Instead it seems simply to take the position that *Williams* held cross-collateral security agreements per se unconscionable. That position is difficult to reconcile with the acceptance of cross-collateral security agreements by the Uniform Commercial Code, *N. J. S. A.* 12A:9-204(5). This section reads: "Obligations covered by

---

[6]Although the U.C.C. was not effective at the time of the *Williams* decision, the court held that its unconscionability section, section 2-302, was a codification of the common law of the District of Columbia, and essentially found unconscionability under it.

a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment." Thus the county district court undertook to declare unconscionable that which the legislature has specifically sanctioned. At the very least this statutory section should have been weighted in any determination of unconscionability under section 2–302. Note, 51 *Cornell L. Q.* 768, 778 (1966) endorses this approach.

■ But even if it were correct to assume unconscionability from the lone fact of retained cross-collateral by the seller, the factual basis for the conclusion is absent from the case. The agreement did not create such collateral. Singer claims that each payment was applied against the cost of the items in the order purchased.[7] In the instant case all items were replevied only because the first, being the most expensive, had not yet been paid off. In fact, even if the method prescribed by the Retail Installment Sales Act for apportioning payments among the various items based on the proportion the price of each bore to the entire debt, neither the sewing machine nor any of the vacuum cleaners would have been paid for in full. All would have been subject to replevin under the Act. Therefore, there is no basis for a finding of unconscionability on this record.[8]

---

[7] The "First-in-First out" method is the recommended approach under the proposed Uniform Consumer Credit Code, § 2.409. As White and Summers in their text on the Uniform Commercial Code have said, "We believe that a wise draftsman will provide for a first-in, first-out method of pro ration * * * A FIFO pro ration is blessed by the UCCC and will avoid the difficulty suggested in the *Walker-Thomas* case, for the debtor will free items of collateral from the security interest as he pays." *White and Summers, Uniform Commercial Code* 802 (1972).

[8] For a more complete discussion of unconscionability, see an excellent note on the Williams case, 51 *Cornell L. Q.* 768 (1966) and Leff, "Unconscionability and the Code—The Emperor's New Clause," 115 *U. Pa. L. Rev.* 485, 551–56 (1967).

## III

■ Although the trial court deemed it unnecessary to discuss the issue of the constitutionality of New Jersey's Replevin Act, *N. J. S. A.* 2A:59–1 *et seq.* in light of its disposition of the case on other issues, we address that question. Defendant Gardner challenges the replevin action taken against him for its failure to afford him notice and a hearing before his property was seized. *Fuentes v. Shevin,* 407 *U. S.* 67, 92 S. Ct. 1983, 32 *L. Ed.* 2d 556, reh. denied, 409 *U. S.* 902, 93 S. Ct. 177, 34 L. Ed. 2d 165 (1972), held the Florida and Pennsylvania replevin statutes, which are nearly identical to New Jersey's in relevant respects, violative of due process since they did not require prior notice and hearing. It does not seem debatable that insofar as our statute deviates from that standard, it too is unconstitutional. We have already implied as much by adopting, in 1973, Rule 4:61–1(a), which imposes such requirements. We take this opportunity to remove any uncertainty remaining on this question. Such a disposition of this issue does not affect the instant parties, for we give it purely prospective effect.

## IV

In concluding as we do that the Singer Company's "One to Thirty-Six Month Plan" is neither unconscionable nor violative of New Jersey's pre-1971 statutory provisions, we do not mean to imply that consumer protection is unnecessary as applied to revolving charge accounts. The 1971 amendments encompassing such sales are a welcome and necessary addition to New Jersey's body of statutory law. However, we reject the mistaken definition of installment sales, adopted by the court below, which would include the Singer plan within the reach of the Act as it stood before 1971. Nor do we accept a finding of unconscionability in the absence of circumstances far more compelling than are present here.

Accordingly, on plaintiff's appeal the judgment of the district court is reversed and the case remanded for entry of judgment for plaintiff and for possession of the articles in question. On defendant's cross-appeal the judgment of dismissal of the counterclaim for damages is affirmed. No costs.

PASHMAN, J. (dissenting). Pending resolution of this lawsuit, the plaintiff's claim only has matured into mootness by virtue of the 1971 amendment to the Retail Installment Sales Act, *N. J. S. A.* 17:16C-1 *et seq.* This legislation concededly includes a revolving charge account such as the Singer Company utilized when it sold the goods to Gardner in 1969. But the defendant's counterclaim presents a justiciable issue.

Notwithstanding, we have undertaken to evaluate the merits of this District Court case in its entirety.

Presenting its inexplicable thesis, this Court has justified a deceptive scheme to avoid the Retail Installment Sales Act. In doing so, it has taken a giant step backward in the world of consumerism.

I subscribe substantially to the reasoning in the very thoughtful opinion of County Court Judge Wood (A.C.). 121 *N. J. Super.* 261 (Cty. D. Ct. 1972). I differ with the trial judge in the disposition of the counterclaim.

The charge of $10 per $100 per year is an effective annual finance charge of 17.92% over the 36-month period. The 1.5% per month which was the Singer finance charge is 18% per year on the declining balance. However, the nuances of late payments (which is a fact of life in the installment world) on the unpaid balance under the Singer plan will inevitably result in more interest being paid than late payments under the Retail Installment Sales Act. *N. J. S. A.* 17:16C-42. But the more serious distinction between the Retail Installment Sales Act and the Singer plan is the necessity to comply with the provisions of the Act hereinafter set forth which are so important for the protection of

the purchaser. These requirements truly speak for the consumer. The requirements for detailed statements and the allocation of payments on a continuing agreement as to further purchases are some of the statutory provisions which give solace to an installment buyer. None of these is required under the Singer plan.

The strained interpretation to which the majority has resorted to justify the subterfuge of the Singer Company does not withstand careful analysis. This defendant went to Singer to purchase a number of appliances and to pay for them in installments. He had paid $65 on account of the purchase of a sewing machine which cost $400. His acquisition of a vacuum cleaner for $70 reflected a downpayment of $2.10 (amount of sales tax). Two more vacuum cleaners were purchased with a deposit of $4.50 (again, the amount of sales tax).

This consumer did not intend to open a continuing charge account similar to those employed by department stores. It is impossible to form a conclusion other than the fact that defendant was "forced" into the transaction if he wanted to make the purchase. He did not ask for this, and surely he never understood the details of this sophisticated transaction.

## I

In 1960, when the Retail Installment Sales Act, *N. J. S. A.* 17:16C-1 *et seq.,* was initially adopted, a retail installment contract was defined as:

* * * any contract entered into in this State between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods, or any part thereof, in 2 or more installments over a period of time, and pursuant to which title to or a lien upon the goods is retained or taken by the retail seller for the payment of the retail buyer's obligation.

My Brother Justices seem to believe that the Singer plan failed to fit within the confines of this definition when in

fact it does in every detail. The majority further proceeds to distinguish an installment sales plan from a revolving charge by the method in which interest is paid. However, the statutory definition clearly does not make this distinction; in fact, it never mentions interest. The time-price differential or interest is first mentioned in *N. J. S. A.* 17: 16C–41 where:

* * * any retail installment contract evidencing the sale of goods [shall not exceed]

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Class IV. On all other goods, an amount not to exceed $10.00 per $100.00 per year.

Therefore, the Singer plan easily conformed to the statutory definition of a retail installment sale, resulting in violation of the statute herein set forth.[1] Subsequent amendments in

---

[1] *N. J. S. A.* 17 :16C–27

Every retail installment contract shall set forth the following separate items:

(a) The cash price of the goods which are the subject matter of the retail installment contract;

(b) The down payment made by the retail buyer, indicating whether made in cash or in goods or partly in cash and partly in goods. The amount of the payment in cash and in goods shall be shown separately. A description of the goods, if any, sufficient for identification, shall be shown;

(c) The unpaid cash balance which shall be the difference between the cash price (subsection (a)) and the down payment (subsection (b));

(d) The amount, if any, if a separate charge is made therefore, included for insurance and other benefits, specifying the coverages and benefits;

(e) The amount of official fees;

(f) The principal balance, which is the sum of subsections (c), (d) and (e);

(g) The amount of the time price differential;

(h) The time balance, which is the sum of subsections (f) and (g), owed by the retail buyer to the retail seller, the number of installments required, the amount of each installment expressed in dollars and the due date or period thereof;

(i) The time sales price, which is the sum of subsections (b) and (h).

1971 (particularly *N. J. S. A.* 17:16C–44.1) specifically dealt with and included the retail charge account or revolving charge plan. Initially, however, no particular treatment was afforded the instant hybrid charge plan. Thus, if covered by the original Act, the charge plan would be controlled under the general provisions of the statute previously noted.

The Singer plan included four elements pertinent to the present matter:

1. The customer is issued a "Singer Credit Card." The card is to remain "the property" of Singer and is to be returned by the customer upon "termination" of the account.

2. Payments are to be "the larger of" the agreed monthly payment or "the company's minimum monthly payment listed on an annexed schedule." The scheduled monthly payment does not decline as the unpaid balance is reduced.

3. Title to the goods purchased remains in the company until the unpaid balance of each separate purchase is fully paid. The goods may not be encumbered or disposed of without the consent of the seller.

4. In the event of default in payment the entire unpaid balance shall, at the seller's option, become immediately due and is to be paid on demand or the seller may "in the manner and as provided by law retake any goods not then paid for" and pursue other remedies, including recovery of attorney's fees. [121 *N. J. Super.* at 268–269].

The majority would have the consumer believe he was getting a better deal with the revolving charge account for reasons which are nebulous. The same majority and the plaintiff concede that Singer's plan failed to:

1. Specify the time-price differential, time-balance and time-sales price as required by *N. J. S. A.* 17:16C–27;

2. Apportion each payment among the separate purchases in proportion to the cash price of the items purchased, as required by *N. J. S. A.* 17:16C–29;

---

The effective interest or time price differential is limited to 10% annually. *N. J. S. A.* 17:16C–41.

Particulars as to separate items must be set forth in additional statements annexed to the contract. *N. J. S. A.* 17:16C–28.

The purchaser must be informed as to the allocation of payments or balances due on individual items. *N. J. S. A.* 17:16C–29.

3. Call for appropriate statements for each purchase, as required by *N. J. S. A.* 17:16C–28;

4. Abide by permissible time-price differential by exceeding 10% per year, the maximum under *N. J. S. A.* 17: 16C–41.

By reason of the foregoing definition of an installment sale, it is crystal clear that the transactions called for by the revolving charge account were exactly the same as those covered by the Retail Installment Sales Act. *N. J. S. A.* 17:16C–1 *et seq.* Consequently, they were retail installment sales intended to be covered by the Act. It follows that the "credit card" device was a subterfuge which plaintiff hopefully expected would avoid the Act. If plaintiff's plan receives judicial sanction, then the seller could have imposed a time-price differential greater than that permitted by the Act. In addition, other requirements of the Retail Installment Sales Act could be avoided by this device. *Singer v. Gardner, supra,* 121 *N. J. Super.* at 269. The basic plan was undoubtedly devised to circumvent and defeat the 10% maximum interest a retail seller could charge a buyer and avoid compliance with all other requirements of law.

With the Retail Installment Sales Act, the Legislature gave us one of our first glimpses of consumer legislation which was, as indicated previously, couched in very broad and all-inclusive language. (See definition of a retail installment contract, *supra.*) At that time, credit schemes were relatively simple since they knew no bounds. But they grew increasingly complex, sophisticated, devious, flexible and open-ended after the Legislature's initial venture into this field in 1960. Plaintiff believes, as does the majority, that there was a tacit or negative approval of the present plan since it was not explicitly mentioned by name in the original Act. I, however, believe that the terms of the 1960 statute were certainly broad enough to include this type of retail installment contract masked in the garb of a retail charge account.

The plan retained a cross-collateral security interest in the purchased merchandise, allowing Singer to repossess every item without first determining whether any one piece had been fully paid for. Mr. Dunn, the store manager, affirmatively testified to this effect. Following repossession, a buyer could not even redeem these items, in contravention of the statute.

The effort expended by the majority to justify this scheme would be better placed in behalf of the world of consumerism which cries out for protection. A subterfuge should be so labelled to deter others from avoiding strict compliance with the consumer statutes. Fortunately, the Legislatures of New Jersey have championed various bills to keep unscrupulous business entities from ripping off the public or engaging in deceptive practices. The 1971 amendment is a clear recognition of this evil which required statutory attention.

This defendant made various purchases totaling $619.60. He was charged $228.87 as the time-price differential, and paid a premium for life insurance to protect Singer. He repaid $469.60; Singer received an additional $180.94 as proceeds from repossession sales, all of which totaled $650.54. For this, the purchaser received nothing by way of retaining any one purchase. And plaintiff never informed defendant as to allocation of payments of balances due on individual items. Perhaps the cost of one vacuum cleaner had been fully paid in the repayment total of $469.60.

In addition to being in violation of the statute, I repeat, this scheme was unconscionable. It should not receive judicial blessing. I cannot agree to the strained and erroneous definition of installment sales adopted by the majority, which would exclude the Singer plan as not being within the reach of the Act as it stood before 1971. The cross-collateral security[2] retained by Singer was not justified because

---

[2]The pertinent portions of the Singer sales agreement state that:
3. Title to the goods purchased hereunder shall remain in you until the unpaid balance of each separate purchase is fully paid.

$469.60 was paid by defendant who received nothing for that sum. All these facts, viewed singly, and more importantly in their totality, form a set of circumstances evidencing gross inequity. I am compelled to support a finding of unconscionability. *N. J. S. A.* 12A:2–302; 18 *A. L. R.* 3d 1305.

## II

The majority unnecessarily has addressed itself to the issue of constitutionality of the Replevin Act. Of course, as matters stand, the Rules of the Supreme Court, *R.* 4:61–1(a), as amended in response to *Fuentes v. Shevin,* 407 *U. S.* 67, 92 *S. Ct.* 1983, 32 *L. Ed.* 2d 556, reh. denied 409 *U. S.* 902, 93 *S. Ct.* 177, 34 *L. Ed.* 2d 165 (1972), set forth the required notice and hearing prior to seizure of chattels. However, the viability of *Fuentes* has been questioned. Mr. Justice White, speaking for the majority, in *Mitchel v. W. T. Grant Company,* 416 *U. S.* 600, 94 *S. Ct.* 1895, 40 *L. Ed.* 2d 406 (1974), distinguished that case from *Fuentes.* He held the Louisiana procedure constitutional although it is remarkably similar to the statutory provisions in *Fuentes* (which provisions the majority in our case concede are similar to New Jersey). If *Mitchell* is constitutionally indistinguishable from *Fuentes* as four Justices clearly hold, I

And, in reference to replevying the goods, the contract partially provides:

4. * * * in the manner and as provided by law, retake any goods not then paid for * * *.

These passages are unquestionably ambiguous and certainly are not as clear-cut as my colleagues on the majority believe. As a matter of fact, Singer has presently altered its contract and has added this sentence:

3. * * * Payments shall be applied first to the unpaid finance charge and any insurance premiums, then to merchandise of which that first purchased shall be deemed first paid for.

If the initial contract was so self-explanatory, why was it amended in that fashion?

would pause and not address myself to the constitutional issue unnecessarily. See discussion 45 *A. L. R.* 3d 1233.

But to the extent that the majority has held the Replevin Act unconstitutional based on *Fuentes,* I respectfully disagree that it should be applied prospectively — meaning from the date of the majority decision. *Fuentes* was decided June 12, 1972. The rule change in New Jersey was adopted June 29, 1973, becoming effective September 10, 1973. The writ of replevin issued July 13, 1971. Judge Wood's decision was rendered on October 27, 1972. The notice of appeal was filed December 6, 1972. We certified the case on our own motion on January 16, 1974.

The Singer Company argues that *Fuentes* should not be applied retroactively to these replevin proceedings since the writ of replevin issued almost a year before *Fuentes* was decided. The courts, however, have taken different approaches to the retroactivity issue.

Where the replevin preceded *Fuentes,* some courts applied the principle with no discussion of the retroactivity issue. *Turner v. Colonial Finance Corp.,* 467 *F.* 2d 202 (5 Cir. 1972) (Mississippi replevin statute); *Sena v. Montoya,* 346 *F. Supp.* 5 (D. N. M. 1972) (New Mexico replevin statute); *McClellan v. Commercial Credit Corp.,* 350 *F. Supp.* 1013 (D. R. I. 1972) (Rhode Island pre-judgment attachment statute); *Thorp Credit, Inc. v. Barr,* 200 *N. W.* 2d 535 (Iowa Sup. Ct. 1972) (Iowa replevin statute); *Inter City Motor Sales v. Szymanski,* 42 *Mich. App.* 112, 201 *N. W.* 2d 378 (1972) (Michigan replevin act); *State ex rel. Williams v. Berrey,* 492 *S. W.* 2d 731 (Mo. Sup. Ct. 1973).

In other cases, the courts have decided that their decisions were prospective only, except as to the cases then before them. *Schneider v. Margossian,* 349 *F. Supp.* 741 (D. Mass. 1972); *Trapper Brown Construction Co., Inc. v. Electromech, Inc.,* 358 *F. Supp.* 105 (D. N. H. 1973) (New Hampshire replevin statute); *Gunter v. Merchants Warren National Bank,* 360

*F. Supp.* 1085 (D. Maine 1973) (Maine pre-judgment attachment statute).

Pure prospectivity was not enunciated; this course would deny a remedy to the parties involved in the case being decided. *Stovall v. Denno,* 388 *U. S.* 293, 87 *S. Ct.* 1967, 18 *L. Ed.* 2d 1199 (1967). It appears equitable to change the law as to the parties before the court to encourage others to challenge unfair legislation.

The Constitution certainly neither prohibits nor requires retrospective application. *Linkletter v. Walker,* 381 *U. S.* 618, 85 *S. Ct.* 1731, 14 *L. Ed.* 2d 601 (1965); *Stale v. Smith,* 37 *N. J.* 481 (1962), *cert.* den. 374 *U. S.* 835, 83 *S. Ct.* 1879, 10 *L. Ed.* 2d 1055 (1963). The question is one of policy. What is the effect of retroactivity on this case and others similarly pending? What is fair and reasonable?

This Court decided *State v. Nash,* 64 *N. J.* 464 (1974). Defendant was charged with a quasi-criminal infraction in 1969. He was sentenced on December 12, 1969. An appeal from this conviction was argued in the Appellate Division on January 11, 1971. On April 8, 1971, we decided *State v. De Bonis,* 58 *N. J.* 182 (1971). On May 12, 1971, the Appellate Division affirmed defendant's conviction; certification was denied by this Court on July 7, 1971 (58 *N. J.* 597). Thereafter, on April 28, 1972, probation was revoked and a jail term re-imposed; other appeals followed. The Appellate Division held that *De Bonis* was not retroactive. With the assistance of strained reasoning (with which I agreed), *De Bonis* was applied retroactively to Mr. Nash.

A middle course is available to us. We may apply *Fuentes* to all cases still on direct appeal at the time that case was decided. That would include the *Singer* case. Or, we can certainly apply *Fuentes* to the *Singer* case alone. The defendant who prevailed as to the declaration of unconstitutionality of the Replevin Act should be rewarded in some fashion for his effort in successfully attacking unconstitutional legislation. In the most restrictive sense, the defend-

ant, at least, should prevail as to the dismissal of the complaint in replevin by reason of *Fuentes*.

Contrary to the majority holding (and without waiting for any court adjudication), Singer disposed of the chattels, which now prevents the return of the items. But the counterclaim of the defendant should be respected to bring about an equitable result. In accordance with *N. J. S. A.* 17:16C–54[3], all costs and charges in connection with the contract should be rendered void. However, by reason of the chattels having been sold by Singer, the "void and unenforceable" charges cannot be applied to the unpaid balance. Since the complaint must be dismissed, said unlawful costs and charges should be recovered by the purchaser. *N. J. S. A.* 12A:2–302.

Accordingly, on plaintiff's appeal, the judgment of the District Court should be affirmed, thereby dismissing the complaint. On defendant's cross-appeal, the judgment of dismissal of the counterclaim for damages should be reversed and the claim remanded to the Burlington County District Court to ascertain the amount of the "void and unenforceable" costs and charges received by Singer in connection with the sales contract and revolving charge plan; judgment should be entered in favor of defendant for that amount.

*For reversal and remandment*—Chief Justice HUGHES and Justices JACOBS, MOUNTAIN, SULLIVAN and CLIFFORD—5.

..*For affirmance*—Justice PASHMAN—1.

---

[3]*N. J. S. A.* 17:16C–54. Unauthorized costs and charges

Whenever, in any retail installment contract under this act, the retail seller or any subsequent holder has knowingly charged, contracted for or received from the retail buyer any costs or charges not authorized by this act, all costs and charges in connection with such contract, other than for insurance and other benefits, shall be void and unenforceable, and any such costs or charges other than for insurance and other benefits shall be applied to the unpaid balance or, if the account has been fully paid, remitted to the retail buyer, and the retail buyer shall be entitled to recover all such costs or charges.