WILLIAM B. KING, PLAINTIFF-APPELLANT, v. SOUTH
JERSEY NATIONAL BANK, DEFENDANT-RESPONDENT.

Reargued September 9, 1974—Decided December 10, 1974.

162

*Mr. Allen S. Zeller,* of Camden Regional Legal Services, argued the cause for the plaintiff-appellant; *Messrs. Saul Ferster and Carl S. Bisgaier,* on the brief.

*Messrs. William E. Reifsteck and Jack N. Hill* argued the cause for defendant-respondent; *Messrs. Farr, Reifsteck & Wolf,* attorneys.

The opinion of the Court was delivered by

HUGHES, C. J. Challenging as invalid the repossession of an automobile (by a secured creditor, after default in payment) this appeal primarily suggests constitutional infirmity in *N. J. S. A.* 12A:9–503, a part of the New Jersey Uniform Commercial Code.[1] It invokes, in the name of constitutional right, the conceptual reach of the policy which would provide protection in the marketplace in cases such as typified by *Fuentes v. Shevin,* 407 *U. S.* 67, 92 *S. Ct.* 1983, 32 *L. Ed.* 2d 556 (1972), *reh. den.* 409 *U. S.* 902, 93 *S. Ct.* 177, 34 *L. Ed.* 2d 165.[2]

The relevant facts and procedural history, uncomplicated and not in dispute, are these: the appellant, William B. King (plaintiff) purchased and received an automobile from a

---

[1] *Secured Party's Right to Take Possession After Default.*

Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. *N. J. S. A.* 12A:9–503.

[2] In *Fuentes* the Supreme Court declared unconstitutional replevin statutes in Florida and Pennsylvania which authorized state officials to seize property without providing the possessor notice and an opportunity to be heard. This holding was severely limited, if not overruled, by *Mitchell v. W. T. Grant,* 416 *U. S.* 600, 94 *S. Ct.* 1895, 40 *L. Ed.* 2d 406 (1974), where the court found no constitutional fault in a Louisiana sequestration statute which authorized seizures bearing much constitutional resemblance to those condemned in *Fuentes.* See opinions of Powell, J., concurring, 416 *U. S.* at 623, 94 *S. Ct.* at 1908, 40 *L. Ed.* 2d at 423; Stewart, J., dissenting, 416 *U. S.* at 629, 94 *S. Ct.* at 1910–1914, 40 *L. Ed.* 2d at 426–430.

dealer, entering into an installment sales contract under which he promised to pay the balance due on a monthly basis. The contract created in the dealer and assigns a security interest in the automobile to secure payment of the monthly installments as they would become due. The contract provided that in the event of default in payment the unpaid balance would become due and payable and the seller and assigns could "without notice or demand for performance or legal process, enter any premises where the goods may be found [and] peaceably take possession of them * * *." The contract also stated "[u]pon default holder shall also have all the remedies of a secured party under the New Jersey Uniform Commercial Code if it is applicable to default hereunder."

Upon delivery of the automobile and execution of the contract, the seller assigned the latter to the respondent South Jersey National Bank (the Bank). Plaintiff defaulted in an overdue monthly payment (which had been called to his attention by notice) and the Bank thereupon invoked the acceleration clause of the contract and peaceably exercised its right to repossess the automobile without notice to plaintiff, as the contract authorized it to do. Plaintiff later offered to make good on the defaulted payment, but this was rejected and he was informed the car would be returned only if he paid the full balance remaining due.

The Bank sent plaintiff a notice that the automobile would be sold at public auction.[3] On the same day plaintiff filed a complaint in the Chancery Division and obtained an order temporarily restraining the sale pending a hearing. Before the hearing date was reached a consent order was entered returning the automobile to plaintiff under certain conditions not here pertinent. Plaintiff then filed an amended complaint containing three counts, (1) for damages for tortious con-

---

[3]Such a notice was required (except under special circumstances) by another section of the Uniform Commercial Code (*N. J. S. A.* 12A:9-504) providing "* * * reasonable notification of the time and place of any public sale * * * shall be sent by the secured party to the debtor, * * *."

version of the automobile, (2) for damages for the unlawful conversion of personal property which was in the automobile[4] and (3) seeking declaratory judgment that *N. J. S. A.* 12A: 9–503, *supra,* was unconstitutional on its face and as applied and that the acceleration clause in the retail installment sales contract was unconscionable.

After answer filed and pretrial conference held, the Bank moved for summary judgment and plaintiff countered with a similar motion. The trial court granted summary judgment for the Bank, dismissing the first and third counts of the complaint, thus upholding the constitutional validity of the repossession and its incidents and negating the claim of unconscionability. Plaintiff appealed from this summary judgment order and this Court granted his motion for certification under *R.* 2:12–2 while the appeal was pending unheard in the Appellate Division, 63 *N. J.* 561 (1973).

Count one (unlawful conversion) falls unless count three (invalidity of seizure and unconscionability of contract) is upheld, and hence our attention is directed to the validity of the allegations of the latter count. Aside from the claim that the acceleration clause in the contract was unconscionable (which we shall mention briefly hereafter), plaintiff's denunciation of the repossession and his plea for judicial repudiation of *N. J. S. A.* 12A:9–503, *supra,* were predicated entirely upon the proposition made in one charge of his amended complaint:

14. Repossession of said vehicle by defendant was allegedly authorized by and taken pursuant to *N. J. S. A.* 12A:9–503.

By a pretrial stipulation the Bank made clear its contention *contra,* that its retaking was based on its private contractual rights and not under the authority of *N. J. S. A.*

---

[4]The second count was later voluntarily dismissed and is not relevant here.

12A:9–503, *supra,* and hence without the assistance or co-operation or involvement of the state.

This refinement of the constitutional issue, *i.e.,* the distinction between private or individual action and "state action" subject to the equal protection and due process clauses of the Fourteenth Amendment, was clearly understood by the trial court. Its opinion supporting summary disposition fully and accurately dealt with the "essential dichotomy between discriminatory action by the State, which is prohibited by the Equal Protection Clause, and private conduct, 'however discriminatory or wrongful,' against which that clause 'erects no shield.' " *Moose Lodge No. 107 v. Irvis,* 407 *U. S.* 163, 172, 92 *S. Ct.* 1965, 1971, 32 *L. Ed.* 2d 627, 637 (1972) ; *Shelley v. Kraemer,* 334 *U. S.* 1, 13, 68 *S. Ct.* 836, 842, 92 *L. Ed.* 1161, 1180 (1948) ;[5] *The Civil Rights Cases,* 109 *U. S.* 3, 3 *S. Ct.* 18, 27 *L. Ed.* 835 (1883). The same philosophy obviously applies to the Due Process Clause.

Thus the court determined, as had been held in a comparable case *(Messenger v. Sandy Motors, Inc.,* 121 *N. J. Super.* 1 (Ch. Div. 1972) ) that the repossession was a private contractual matter rather than a state action, and so was immune from constitutional attack. This conclusion is supported by an overwhelming majority of federal and state courts which have held (many in very recent times) that "self-help" repossession is not an act under color of state laws and thus no state action is involved.[6]

---

[5] "* * * the principle has become firmly imbedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct * * *." [*Shelley v. Kraemer, supra*]

[6] *Turner v. Impala Motors,* 503 F. 2d 607 (6th Cir. 1974) ; *Gibbs v. Titelman,* 502 F. 2d 1107 (3d Cir. 1974) ; *Brantley v. Union Bank and Trust Co.,* 498 F. 2d 365 (5th Cir. 1974) ; *Nichols v. Tower Grove Bank,* 497 F. 2d 404 (8th Cir. 1974) ; *Bowman v. Chrysler Credit Corp.,* 496 F. 2d 1322 (5th Cir. 1974) ; *Nowlin v. Professional Auto Sales, Inc.,* 496 F. 2d 16 (8th Cir. 1974), cert. den., — U. S. —, 95 S. Ct. 328, 42 L. Ed. 2d 283 (1974) ; *Fletcher v.*

■ Before discussing the argument that the statute mentioned and the action allegedly taken under it came within the "state action" theory, we note the claim that the acceleration clause of the contract was unconscionable. Our scrutiny of the factual record shows nothing that would justify us in declaring that such a clause, universally acceptable in such transactions and in the business world is, or in its exercise in this case was, unconscionable. In the absence of extraordinary circumstances demonstrating oppression or grossly unfair dealing or the like not here present, or conflict with the public policy of the state (*cf. Unico v. Owen,* 50 *N. J.* 101 (1967)), the court should not declare unconscionable the provisions for acceleration and for self-help repossession de-

*Rhode Island Hosp. Trust Nat'l Bank,* 496 *F.* 2d 927 (1st Cir. 1974), *cert.* den., —— U. S. ——, 95 S. Ct. ——, 42 L. Ed. 2d —— (1974) ; *James v. Pinnix,* 495 *F.* 2d 206 (5th Cir. 1974) ; *Shirley v. State Nat'l Bank,* 493 *F.* 2d 739 (2d Cir. 1974), *cert.* den. —— U. S. ——, 95 S. Ct. 329, 42 L. Ed. 2d 284 (1974) ; *Adams v. Southern Cal. First Nat'l Bank,* 492 *F.* 2d 324 (9th Cir. 1973), *cert.* den. —— U. S. ——, 95 S. Ct. 325, 42 L. Ed. 2d 282 (1974) ; *Bichel Optical Labs., Inc. v. Marquette Nat'l Bank,* 487 *F.* 2d 906 (8th Cir. 1973) (*reh. den.* Dec. 6, 1973) ; *Kinch v. Chrysler Credit Corp.,* 367 *F. Supp.* 436 (E. D. Tenn. 1973) ; *Johnson v. Associates Finance,* 365 *F. Supp.* 1380 (S. D. Ill. 1973) ; *Mojica v. Automatic Employees Credit Union,* 363 *F. Supp.* 143 (N. D. Ill. 1973), U. S. *cert.* granted *sub nom. Gonzalez v. Automatic Employees Credit Union,* 415 *U. S.* 947, 94 *S. Ct.* 1467, 39 *L. Ed.* 2d 562 (1974) ; *Shelton v. General Electric Credit Corp.,* 359 *F. Supp.* 1079 (M. D. Ga. 1973) ; *Kirksey v. Theilig,* 351 *F. Supp.* 727 (D. Colo. 1972) ; *Pease v. Havelock Nat'l Bank,* 351 *F. Supp.* 118 (D. Neb. 1972) ; *Greene v. First Nat'l Exch. Bank,* 348 *F. Supp.* 672 (W. D. Va. 1972) ; *Oller v. Bank of America,* 342 *F. Supp.* 21 (N. D. Cal. 1972) ; *McCormick v. First Nat'l Bank,* 322 *F. Supp.* 604 (S. D. Fla. 1971) ; *Brown v. United States Nat'l Bank,* 509 *P.* 2d 442 (Ore. Sup. Ct. 1973) ; *Hight v. Belgrade State Bank, appeal dismissed as moot,* 514 *P.* 2d 766 (Mont. Sup. Ct. 1973), *cert.* den.. —— U. S. ——, 95 S. Ct. 305, 42 L. Ed. 2d 266 (1974) ; *Northside Motors v. Brinkley,* 282 *So.* 2d 617 (Fla. Sup. Ct. 1973) ; *Giglio v. Bank of Delaware,* 307 *A.* 2d 816 (Del. Ch. Ct. 1973) ; *Messenger v. Sandy Motors, Inc., supra. Contra, Watson v. Branch County Bank,* 380 *F. Supp.* 945 (W. D. Mich. 1974) ; *Boland v. Essex County Bank & Trust Co.,* 361 *F. Supp.* 917 (D. Mass. 1973).

liberately agreed to in the contract between the parties in this case.

█ On the main issue it must first be noticed that the right of self-help repossession of property under circumstances such as involved here, far from being a right created (and thus the fruit of "state action") by *N. J. S. A.* 12A:9–503, *supra,* or that statute's predecessor, Section 16 of the Uniform Conditional Sales Act codified by *N. J. S. A.* 46:32–22, has roots deep in the common law and has been recognized for centuries. 2 *Pollock & Maitland, The History of English Law* 573 (2d ed. 1952), 2 *Blackstone, Commentaries on the Laws of England* 857–858 (4th ed. T. Cooley 1899). Nor did the Uniform Commercial Code or its predecessor statute distort such a common law right, as had the Florida and Pennsylvania statutes (invalidated in *Fuentes, supra*) which had so radically altered the ancient replevin remedy that, as Justice Stewart said "they bear very little resemblance to it." [407 *U. S.* at 78, 92 *S. Ct.* at 1993, 32 *L. Ed.* 2d at 569]

The New Jersey Study Comment pertaining to *N. J. S. A.* 12A:9–503 mentions:

This section carries forward the provisions of *R. S.* 46:32–22 of the Uniform Conditional Sales Act * * *. Pursuant to this section the secured party may take possession ex parte if such can be done without breach of peace * * *.

By the same token the Uniform Commercial Code Comment to *N. J. S. A.* 12A:9–503 suggests that:

* * * This Article follows the provisions of the earlier uniform legislation in allowing the secured party in most cases to take possession without the issuance of judicial process * * *.

Again, the New Jersey Study Comment to *N. J. S. A.* 12A:9–504 (outlining safeguards to the debtor in connection with the disposal of the secured property) suggests that:

* * * This section is designed to give the secured party the utmost freedom of action in disposition of the collateral subject only to the "commercially reasonable" requirement.

The Uniform Commercial Code Comment to the last mentioned section also emphasizes the requirement that the method of disposition of the repossessed article must be "commercially reasonable" and applies certain safeguards with respect to such post-seizure disposition, and accounting for proceeds of sale to satisfy the outstanding debt.

■ The primary purpose of inclusion of such safeguards in the Uniform Conditional Sales Act was protection of the buyer, *Pacific Discount Co., Inc. v. Jackson,* 68 *N. J. Super.* 331 (App. Div. 1961) *rev'd on other grounds,* 37 *N. J.* 169 (1962); *Bancredit Inc. v. Meyers,* 62 *N. J. Super.* 77 (App. Div. 1960); *Commercial Credit Corp. v. Lawley,* 47 *N. J. Super.* 207 (App. Div. 1957); *Plainfield Motor Co. v. Salamon,* 13 *N. J. Misc.* 570, 180 *A.* 428 (D. Ct. 1935), and similar recognition of the need for buyer protection in the Uniform Commercial Code portrays the same purpose. But neither statute enlarged the basic common law right of self-help repossession.[7]

■ If, then, the substance of the challenged statute and its predecessor amounted to no more than codification of existing law (albeit they provided additional post-seizure safeguards to the original buyer in connection with notice of

---

[7]Viewing the security holder as one justified in asserting a claim of title, it was thought that "the right to retake one's goods peaceably 'seemed' to be established beyond all doubt." [Branston, *The Forcible Reception of Chattels,* 28 *L. Q. Rev.* at 262, 269 (1912)]

"II. *Recaption or reprisal* is another species of remedy by the mere act of the party injured. This happens, when any one hath deprived another of his property in goods or chattels personal, * * *: in which case the owner of the goods * * * may lawfully claim and retake them, wherever he happens to find them; so it be not in a riotous manner, or attended with a breach of the peace. The reason for this is obvious; since it may frequently happen that the owner may have this only opportunity of doing himself justice: his goods may be afterwards conveyed away or destroyed; * * * if he had no speedier remedy than the ordinary process of law. If, therefore, he can so contrive it as to gain possession of his property again, without force or terror, the law favours and will justify his proceeding." [2 *Blackstone, supra,* at 857–858]

sale, disposition of proceeds and the like), it seems obvious that no new right was created by the mere delineation of this procedure in the statute. Codification is merely a legislative reorganization of existing law into acceptable statutory form. Legislative energy is expended, but only to the end that the law should remain the same. Nothing has been created or destroyed (at least with regard to the challenged section 12A:9–503) and such legislative activity clearly does not constitute "state action" under the Fourteenth Amendment. It is in effect a passive perpetuation of the common law and as such does not "significantly" involve the state in the denial of due process rights. As was the case at common law, the state is totally removed from the repossession process, at least until after the event, when certain additional safeguards come into play for the protection of the original buyer, junior creditors and subsequent owners.

The concept that codification of the common law amounts to state action "encouraging" forms of private conduct, simply because of the fact of legislation, has been authoritatively rejected. *Turner v. Impala Motors*, 503 *F.* 2d 607 (6th Cir. 1974) ; *Nichols v. Tower Grove Bank*, 497 *F.* 2d 404 (8th Cir. 1974) ; *Nowlin v. Professional Auto Sales, Inc.*, 496 *F.* 2d 16 (8th Cir. 1974), *cert.* den., — *U. S.* —, 95 S. Ct. 328, 42 *L. Ed.* 2d 283 (1974) ; *Bond v. Dentzer*, 494 *F.* 2d 302 (2d Cir. 1974) ; *Shirley v. State Nat'l Bank*, 493 *F.* 2d 739 (2d Cir. 1974), *cert.* den. – —*U. S.* —, 95 S. Ct. 329, 42 *L. Ed.* 2d 284 (1974) ; *Adams v. Southern Cal. First Nat'l Bank*, 492 *F.* 2d 324 (9th Cir. 1973), *cert.* den., — *U. S.* —, 95 S. Ct. 325, 42 *L. Ed.* 2d 282 (1974) ; *Bichel Optical Labs., Inc. v. Marquette Nat'l Bank*, 487 *F.* 2d 906 (8th Cir. 1973).

In *Messenger, supra,* Judge Herbert properly adopted the philosophy expressed in a brief amicus curiae which had been filed in *Adams v. Egley*, 338 *F. Supp.* 614 (S. D. Cal. 1972), *rev'd sub nom. Adams v. Southern Cal. First Nat'l Bank, supra.* This brief, filed by Professor Mentschikoff on behalf of the permanent editorial board for the Uniform Com-

mercial Code, stated with regard to Section 12A:9–503, *supra,* that:

It cannot be that codifying a generally understood practice of ancient and honorable lineage and surrounding it with safeguards renders the practice unconstitutional.[8]

The same was otherwise stated by the Second Circuit Court of Appeals in *Shirley, supra,* and *Bond, supra,* in rejecting the proposal that mere codification "encouraged" the existing practice:

Codification did not encourage the practice one whit. * * * [T]he legislation made it less attractive by providing greater safeguards * * *. [*Shirley, supra,* 493 F. 2d at 744]

█ █ The Fourteenth Amendment was not intended to impose upon the sovereign states a new, inflexible, doctrinaire pattern of affirmative rectitude. Rather, it sought to preserve values and rights sensed to be inherent in the human condition, making sure that the states, as viable as was con-

---

[8] In her article adapted from such brief, which ended with the last mentioned sentence, Professor Mentschikoff suggested the economic and other consequences of requiring prior judicial action in the context of self-help repossession as follows:

"(1) The number of repossessions as opposed to peaceful rescheduling of payment of delinquent accounts would increase; (2) The size of deficiency judgments to be paid by defaulting debtors would be increased by the additional costs involved; (3) The general interest rates charged to all debtors would rise to take care of the increased losses in salvage value of the collateral resulting from the inevitable delay attendant on any court procedure and the increased number of 'skips'; (4) Additional burdens would be imposed on an already overburdened court system with higher taxes to be paid by the general public; (5) The number of buyers whose credit would preclude purchase would rise, thus affecting the total number of cars manufactured, with a consequent adverse impact on our total economy; (6) One in ten thousand defaulting debtors might conceivably be saved a week or 10–60 days temporary deprivation of the use of an automobile." Mentschikoff, *Peaceful Repossession Under the Uniform Commercial Code: A Constitutional and Economic Analysis,* 14 *Wm. & Mary L. Rev.* 767, 769–70 (1973).

sidered to be their membership in the federal union, would never dare by law or other action to interfere with the equal sharing of those benefits, nor withdraw any except by due process.[9] Thus it is that the Amendment erects no shield (*The Civil Rights Cases, supra*) against private action however wrongful, leaving to the individual states the freedom to deal therewith according to their lights. The Amendment, rather, immunizes the people from state action which might affirmatively and significantly impinge upon fundamental rights, so thought to be inherent in their nature rather than created by any constitution or other human work.

Seen in this way, it is clear that the *source* of state action which may interfere with basic rights is broad in concept, including each branch of government having capacity so to encroach, whether legislative, judicial or executive.[10] The source of such prohibited action may even be the people themselves, and in such case they too will be restrained, as from adopting an amendment to a state constitution deemed offensive to the Fourteenth Amendment (*Reitman v. Mulkey,* 387 *U. S.* 369, 87 *S. Ct.* 1627, 18 *L. Ed.* 2d 830 (1967)).[11]

---

[9]"For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Fuentes, supra,* 407 *U. S.* at 80, 92 *S. Ct.* at 1994, 32 *L. Ed.* 2d at 569, quoting from *Baldwin v. Hale,* 68 *U. S.* (1 Wall) 223, 233, 17 *L. Ed.* 531, 534 (1864).

[10]*Ex Parte Virginia,* 100 *U. S.* 339, 25 *L. Ed.* 676 (1880) ; *Carter v. Texas,* 177 *U. S.* 442, 20 *S. Ct.* 687, 44 *L. Ed.* 839 (1900). *E. g. Neal v. Delaware,* 103 *U. S.* 370, 26 *L. Ed.* 567 (1881) (executive action) ; *Snowden v. Hughes,* 321 *U. S.* 1, 64 *S. Ct.* 397, 88 *L. Ed.* 497 (1944) (executive action) ; *Burton v. Wilmington Parking Authority,* 365 *U. S.* 715, 81 *S. Ct.* 856, 6 *L. Ed.* 2d 45 (1961) (executive action) ; *Coleman v. Wagner College,* 429 *F.* 2d 1120 (2d Cir. 1970) (executive action) ; *Shelley v. Kraemer, supra* (judicial action) ; *Sniadach v. Family Finance Corp.,* 395 *U. S.* 337, 89 *S. Ct.* 1820, 23 *L. Ed.* 2d 349 (1969) (legislative action)

[11]The adoption of Proposition 14 by the people of California, amending the State Constitution, effectively repealed existing legislation and constitutionalized (thus encouraging in that special way) racial dis-

The *nature* of any such state action, however, to fall within the proscriptive orbit of the Fourteenth Amendment, is more constricted. It must be affirmative and significant before it becomes vulnerable. Thus the failure of a state to legislatively suppress a private wrong, or to alter common law rights which existed at the birth of the Fourteenth Amendment, does not fall within its interdiction. Mere passivity in state action is not proscribed. State action is not invoked; it is restrained. So, as shield rather than sword, does the Amendment secure to the people due process and equal protection of the laws.

Thus state neutrality, such as here demonstrated in 12A: 9–503, *supra,* neither commanding nor forbidding the action contracted for between the parties, is far from the state encouragement of the private wrong condemned in *Reitman, supra,* that being in the area of racial discrimination, conduct particularly sensitive and offensive and at which the Fourteenth Amendment was significantly aimed.[12] Nor did the Bank in its repossession purport to be exercising a state function, as sometimes causes an action taken by a private organization, regulated by the state and given much power, to seem to be acting under color of state law, thus becoming accountable under the Fourteenth Amendment. *Burton v. Wilmington Parking Authority, supra; PUC D. Columbia v. Pollak,* 343 *U. S.* 451, 72 *S. Ct.* 813, 96 *L. Ed.* 1068 (1952); *Marsh v. Alabama,* 326 *U. S.* 501, 66 *S. Ct.* 276, 90 *L. Ed.* 265 (1946); *Smith v. Allwright,* 321 *U. S.* 649, 64 *S. Ct.* 757, 88 *L. Ed.* 987 (1944); *Coleman v. Wagner College,*

---

crimination in private housing. Both the United States Supreme Court and the California Supreme Court held that the adoption of this amendment was sufficient to make the state an active participant in wrongdoing. [*Reitman, supra*]

12"* * *[R]acial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute 'state action' with respect to it than would be required in other contexts * * *." [*Coleman v. Wagner College, supra,* Friendly, J., concurring, 429 *F.* 2d at 1127]

*supra.* Governmental regulation of the Bank here, however, did not reach such extreme stage, nor confer such an image of state power and thus the state was not even an apparent participant. *Moose Lodge No. 107 v. Irvis, supra.*

Nor is support for plaintiff's argument to be found in several of the cases[13] cited by him for they are inapposite, involving either actions of state officials acting in concert with a private individual, private parties acting under semblance or pretense of being the state's agents, or a law or state-enforced custom which requires or compels private wrongful acts, none of which elements exists in the present case. The Bank's authority to repossess, as stated, was based on a contractual right, a private act taken by the Bank to protect its security interest in personal property that was subject to the installment sales contract entered into by plaintiff.

Again, certain of the statutory sequelae of the completed repossession are pointed to in support of the concept of state involvement therein, such as the steps ordained for re-sale (*N. J. S. A.* 12A:9–504, *supra*), the providing of a mechanism for the issuance of an ownership certificate for a repossessed vehicle (*N. J. S. A.* 39:10–15), procedures for the use of state forms and personnel to effect title changes, and availability of the court system to obtain and enforce deficiency judgments. None of these factors is relevant to the nature of the repossession and would be operative, in the case of a motor vehicle, even had it been repossessed after notice and a judicial hearing. All are insufficient to significantly involve the state in the challenged seizure. *Moose Lodge*

---

[13]*Adickes v. S. H. Kress & Co.,* 398 *U. S.* 144, 90 *S. Ct.* 1598, 26 *L. Ed.* 2d 142 (1970) ; *United States v. Guest,* 383 *U. S.* 745, 86 *S. Ct.* 1170, 16 *L. Ed.* 2d 239 (1966) ; *United States v. Price,* 383 *U. S.* 787, 86 *S. Ct.* 1152, 16 *L. Ed.* 2d 267 (1966) ; *Griffin v. Maryland,* 378 *U. S.* 130, 84 *S. Ct.* 1770, 12 *L. Ed.* 2d 754 (1964) ; *Lombard v. Louisiana,* 373 *U. S.* 267, 83 *S. Ct.* 1122, 10 *L. Ed.* 2d 338 (1963) ; *Williams v. United States,* 341 *U. S.* 97, 71 *S. Ct.* 576, 95 *L. Ed.* 774 (1951).

No. 107 v. Irvis, supra; Adams v. Southern Cal. First Nat'l Bank, supra; Kirksey v. Theilig, 351 F. Supp. 727 (D. Colo. 1972); Nichols v. Tower Grove Bank, supra.

But plaintiff belatedly suggests that a statute codifying the common law, even though it does not (as we have seen) constitute "state action" within reach of Fourteenth Amendment condemnation, may nevertheless (under a more relaxed view) constitute action offensive to the New Jersey Constitution and, hence, be amenable to correction by the Court. He cites in particular Article I, par. 1 of our 1947 Constitution[14] and Article I, par. 7[15] thereof.

██ ██ The power of the Court to enforce rights recognized by the New Jersey Constitution, even in the complete absence of implementing legislation, is clear. Robinson v. Cahill, 62 N. J. 473 (1973), cert. den. sub nom. Dickey v. Robinson, 414 U. S. 976, 94 S. Ct. 292, 38 L. Ed. 2d 219 (education, N. J. Const. (1947), Art. VIII, § 4, par. 1); Cooper v. Nutley Sun Printing Co., Inc., 36 N. J. 189, 196 (1961) (collective bargaining, N. J. Const. (1947), Art. I, par. 19); Gray v. Serruto Bldrs., Inc., 110 N. J. Super. 297, 306 (Ch. Div. 1970) (racial discrimination in housing, N. J. Const. (1947), Art. I, par. 1, par. 5). Just as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail them through its silence, and the judicial obligation to protect the fundamental rights of individuals is as old as this country. Chief Justice Marshall said in Marbury v. Madison, 5 U. S. (1 Cranch) 137, 163, 2 L. Ed. 60, 69 (1803):

---

[14]N. J. Const. (1947), Art. I, par. 1 states:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

[15]N. J. Const. (1947), Art. I, par. 7 reads:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.

The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.

But we see nothing here that would abridge any fundamental right and thereby come into conflict with the New Jersey Constitution. Article I, par. 1 of our State Constitution (and its predecessor in our 1844 Constitution) is a "general recognition of those absolute rights of the citizen which were a part of the common law." *Ransom v. Black,* 54 *N. J. L.* 446, 448 (Sup. Ct. 1892), *aff'd* 65 *N. J. L.* 688 (E. & A. 1893). The standard to be applied in determining whether a fundamental constitutional right exists requires the reviewing court to look to "the 'traditions and [collective] conscience of our people' to determine whether a principle is 'so rooted [there] * * * as to be ranked as fundamental.'" *Griswold v. Connecticut,* 381 *U. S.* 479, 493, 85 *S. Ct.* 1678, 1686, 14 *L. Ed.* 2d 510, 520 (1965) (Goldberg, J., concurring) cited in *State v. Nugent,* 125 *N. J. Super.* 528, 534 (App. Div. 1973).

Bargaining in the marketplace and contracting in ways inoffensive to law, morals, honesty or public policy, practices recognized by long tradition and neither created nor forbidden by law, would not seem to us to involve a question of fundamental rights, nor to be offensive to either of the sections of the New Jersey Constitution relied on by plaintiff. It must be remembered that by force of the contract here involved there was a duality of property interest in this automobile, and that "[r]esolution of the due process question" (under both State and Federal Constitutions) "must take account not only of the interests of the buyer of the property but those of the seller as well." *Mitchell v. W. T. Grant Co., supra,* 416 *U. S.* at 604, 94 *S. Ct.* at 1898, 40 *L. Ed.* 2d at 412.

The buyer's option not to pay and the security holder's option to retrieve its goods (in the way in which it did), involved no breach of fundamental right, but are measured in effect by the private contractual relationship of the parties,

with which the court in these circumstances must not interfere lest it, itself, encroach upon fundamental right by withdrawing from the parties their traditional freedom to contract.

In *Griswold, supra,* (which dealt with invasion of the right of privacy in the marriage relationship) the Supreme Court of the United States asserted that it did not

sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions. [381 *U. S.* at 482, 85 *S. Ct.* at 1680, 14 *L. Ed.* 2d at 513]

No more does this Court. The judgment of the Chancery Division is affirmed.

CLIFFORD, J. (concurring). I agree with the majority's decision to uphold the validity under the state constitution of self-help repossession by holders of security interests. I also am in accord with the declaration that *N. J. S. A.* 12A:9–503 does not contravene federal due process requirements for want of the requisite finding of "state action." But I am obliged to express my disagreement with those portions of the rationale expressed in the majority opinion which unduly stress the "passivity" and "neutrality" of legislative re-enactment of the common law, inasmuch as I fear that language may cloud rather than clarify the law under which later cases will arise.

The right of the creditor to exercise self-help and recapture the collateral upon default in the payment of the underlying obligation has long been recognized, albeit with varying degrees of legal restraint over the centuries. *See generally McCall,* "The Past as Prologue: A History of the Right to Repossess," 47 *S. Cal. L. Rev.* 58 (1973). But to emphasize, as the Court's opinion does, that codification of a right which, in some essential form, was recognized in the past determines whether state action of a constitutional magnitude exists is, at best, disturbing and, at worst, seriously misleading.

The legislature did something when it enacted *N. J. S. A.* 12A:9–503. The state was not passive. In effect, it sanctioned and perhaps even encouraged creditors in their use of self-help repossession. But I do not understand that act to be the sort of affirmative conduct giving rise to state action of a constitutional grain. *See* Burke & Reber, "State Action, Congressional Power and Creditors' Rights: An Essay on the Fourteenth Amendment," 46 *S. Cal. L. Rev.* 1003, 1097–1114 (1973) & 47 *S. Cal. L. Rev.* 1, 13–14 (1973).

*N. J. S. A.* 12A:9–503 permits a creditor to exercise self-help in retaking property in which he possesses a valid security interest. The statute in no way commands the creditor so to do — it simply authorizes. And mere authorization of private conduct does not *ex necessitate* comprise "state action." To hold that the passage of such a law invokes the Fourteenth Amendment would draw within the ambit of the term "state action" activity expressly or by implication covered by statute, as well as private conduct in other fields — business and otherwise — which in the slightest insignificant manner would be affected or influenced by legislation. Not much imagination need be summoned to detect the dangers implicit in such an expansive definition of "state action." I favor here a course of restraint, not only to obviate the necessity of reckoning with such dangers in future cases but also to reduce that uncertainty in the law which causes rather than avoids hardship. I steer clear of distorting beyond recognition the meaning of "state action"

PASHMAN, J. (dissenting). In this case, the majority upholds the legality of self-help repossession by holders of security interests in automobiles purchased under retail installment sales contracts as consumer goods. I cannot do so. I am convinced both that the majority is wrong in its conclusion that the due process clause of the federal constitution is inapplicable to the practices at issue here — a

conclusion which concededly is supported by the well-nigh overwhelming weight of authority on this much litigated question[1] — and, of far greater importance, that it is wrong in its rejection of challenges based upon *N. J. Consl.* (1947), Art. I, par I and *N. J. S. A.* 12A:2–302. On the first issue we are of course ultimately bound by the decisions of the United States Supreme Court[2], but on the latter issues this Court is the final arbiter and has much power to advance or retard the development of a consumer market place based on principles of good faith and fair dealing. Today's decision does not advance that ideal.

## I

*N. J. S. A.* 12A:9–503 states:

Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action.

It is one strand in a web of statutory regulation of self-help repossession of automobiles. Persons who engage in the business of making or financing retail installment sales of automobiles must be licensed by the commissioner of banking. *N. J. S. A.* 17:16C–2. The terms and performance of retail installment sales contracts are substantially regulated by *N. J. S. A.* 17:16C–1 *et seq.,* and the commissioner has the power to suspend, revoke, or refuse to renew the licenses of sellers or financers who fail to perform their contractual obligations, violate the laws governing retail installment sales,

---

[1]Defendant has provided the Court with a compilation of 46 reported and unreported cases dealing with this question. Of these, 43 have upheld self-help repossession and 3 have overturned it.

[2]Certiorari has been granted in *Gonzalez v. Automatic Employees Union,* 415 *U. S.* 947, 94 *S. Ct.* 1467, 39 *L. Ed.* 2d 562 (1974). The pendency of this case has, of course, no bearing on this Court's determination of the merits in the present matter.

or "[o]therwise demonstrate unworthiness, bad faith or dishonesty." *N. J. S. A.* 17:16C–10. The retention of a security interest in an automobile by a seller or financer must be noted on the certificate of origin or ownership by the secured party and filed with the director of motor vehicles. *N. J. S. A.* 39:10–8, 9, 11.

The parties may define for themselves what actions on the part of the debtor constitute default. *N. J. S. A.* 12A:9–501, *White & Summers, Uniform Commercial Code*, § 26–2 at 956–57 (1972), and they may, subject to certain limitations set out in *N. J. S. A.* 12A:9–502, specify what remedies are available to the creditor in case of default. In this case, as in virtually all retail installment sales of automobiles, the parties signed a preprinted form contract provided by the seller. It provided, among other things, that

* * * Upon default holder shall also have all of the remedies of a secured party under the New Jersey Uniform Commercial Code if it is applicable to default hereunder. Customer agrees in any such case to pay said amount or, at holder's election, to deliver the goods to holder, and holder may, without notice or demand for performance or legal process, enter any premises where the goods may be found, peaceably take possession of them and custody of anything found in them, and retain all payments as compensation for use of the goods while in the Customer's possession. * * *.

Such self-help repossession provisions are almost universal in contracts for retail installment sales of automobiles. *See, e. g.,* 5 *Henson and Davenport, Uniform Laws Annotated,* 347–62 (1968). Even in the absence of any contractual provision for self-help repossession, however, *N. J. S. A.* 12A:9–503 gives the creditor the right to seize the goods on the debtor's default.

When an automobile is repossessed by a secured creditor, he must file with the Division of Motor Vehicles a notice describing the vehicle, naming the person from whom it was taken, and stating his legal authority for his repossession. *N. J. S. A.* 39:10–15. The person from whom the vehicle was repossessed must surrender his title papers to the Di-

vision upon demand and the Division may seize the papers if he fails to do so. The secured creditor cannot demand the papers himself from the debtor for submission to the Division. 1951–53 *Op. Atty. Gen.* 171 (1953).

The conduct of the secured creditor after repossession is governed primarily by *N. J. S. A.* 12A:9–504. Where, as in this case, the secured creditor is an assignee of the dealer, the secured creditor generally holds a "public sale" pursuant to *N. J. S. A.* 12A:9–504(3) at which the dealer may be the only bidder; the dealer then resells the car to another retail buyer. Comment, "Business as Usual: An Empirical Study of Automobile Deficiency Judgment Sales in the District of Columbia," 3 *Conn. L. Rev.* 511 (1971); Shuchman, "Profit on Default: An Archival Study of Automobile Repossession and Resale," 22 *Stan. L. Rev.* 20 (1969). After each resale a new certificate of ownership must be issued by the Division of Motor Vehicles. *N. J. S. A.* 39:10–15. Failure to properly obtain such a certificate renders the transfer of title ineffective (thus defeating the purpose of repossession), *Eggerding v. Bicknell,* 20 *N. J.* 106 (1955); *Velkers v. Glens Falls Insurance Co.,* 93 *N. J. Super.* 501 (Ch. Div. 1967), aff'd 98 *N. J. Super.* 166 (App. Div. 1967), certif. den. 51 *N. J.* 388 (1968), and may prevent the purchaser from obtaining a registration certificate and license plate. *N. J. S. A.* 39:10–18. It would appear that the Division of Motor Vehicles may hold a hearing and prevent transfer of title by a person who has wrongfully repossessed an automobile. *N. J. S. A.* 39:10–16.

Repossession in New Jersey need not be performed by a public officer. *N. J. S. A.* 12A:9–503. It is to be expected, however, that there is considerable cooperation between persons who frequently engage in self-help repossession and the police, both to prevent the repossessors from being arrested for auto theft and to save the police the burden of listing repossessed automobiles as stolen vehicles, when the purchaser reports their disappearance. *See Boland v. Essex County Bank & Trust Co.,* 316 *F. Supp.* 917 (D. Mass.

1973); Shuchman, "Profit on Default: An Archival Study of Automobile Repossession and Resale," *supra*, 22 *Stan. L. Rev.* 20 (1969). In their briefs, plaintiff contends and defendant concedes that the bank in this case kept the Camden police informed of repossession activities.

The secured party who seeks to repossess goods sold under a retail installment sales contract is not obliged either to notify the debtor in advance or to give him an opportunity to present reasons why the creditor should not repossess. *N. J. S. A.* 12A:9–503. Repossession may be accomplished by stealth, *Cherno v. Bank of Babylon*, 54 *Misc.* 2d 277, 282 *N.Y.S.* 2d 114 (N.Y. Sup. Ct. 1967), aff'd 29 *A. D.* 2d 767, 288 N.Y.S. 2d 862 (N.Y. App. Div. 1968), as it was in this case; by guile, *F.A. North & Co. v. Williams*, 120 *Pa.* 109, 13 A. 723 (Pa. Sup. Ct. 1888); or by subtle show of intimidating force, *Owens v. First American Nat'l. Bank*, 6 *U.C.C. Rep.* 427 (Tenn. Ct. App. 1968). The only limitation on the remedy is that it not be accompanied by actual breach of the peace.[3] Independently of any injury he may suffer from the loss of the goods, the debtor from whom goods are repossessed may suffer serious humiliation, indignity and emotional upset from the repossession process itself.[4]

The following is one scholar's characterization of self-help repossession:

The men hired to repossess consumer goods * * * are usually menacing in appearance and manner. Their tactics are often forceful and crude, and the debtor is usually traumatized by the whole process. * * * "[R]epossession is a knockdown, drag-out battle waged

---

[3]This phrase appears not to have been construed by the courts of this State in modern times. Other jurisdictions vary substantially in their construction of the term. *White & Summers, Uniform Commercial Code*, § 26–6 at 966–71 (1972). One would hope that this Court would construe "breach of the peace" so as to prohibit the abuses permitted in the cases cited above.

[4]*Cf. Caplovitz, Debtors in Default*, 14–1 – 14–38 (1971) amply documenting the deleterious impact of creditor collection tactics on the health and well-being of debtors.

on both sides by cunning guile and a complete disregard for the rules of fair play." [quoting 2 *Gilmore, Secruity Interests in Personal Property*, § 44.1 (1965)]. [Neth, "Repossession of Consumer Goods: Due Process for the Consumer: What's Due the Creditor," 24 *Case W. Res. L. Rev.* 7, 49 (1972)].

Self-help repossession of consumer goods is now largely limited to automobiles sold under retail installment sales contracts. Comment, "No judicial Repossession — Reprisal in Need of Reform," 11 *B.C. Ind. & Comm. Rev.* 435, 459 n. 121 (1970). The Court is thus concerned in this case primarily with repossession of automobiles. At one time, a car might properly have been characterized as a luxury item. With the spread in New Jersey of a suburban life style and the concomitant decay of public transit, many persons find an automobile a necessity, both for commuting to their places of employment and for doing essential shopping. Even temporary deprivation of the use of a car may have serious consequences for such people. *Cf. Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358, 386 (1960).

Plaintiff bases his attack on *N. J. S. A.* 12A:9–503 on a variety of grounds. I find it necessary to consider only his claim to procedural due process under *U. S. Const.,* Amend. XIV and *N. J. Const.* (1947), Art. I, par I and his contention that defendant's conduct was unconscionable under *N. J. S. A.* 12A:2–302.

## II

The fourteenth amendment to the federal constitution declares, "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law * * *." In *Fuentes v. Shevin,* 407 *U. S.* 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972), this was unequivocally held to mean that a purchaser of consumer goods under a retail installment sales contract must be provided notice and an opportunity for an adversary hearing prior to being deprived of the use of his goods, even temporarily, by a secured creditor utilizing

a replevin statute. Certain features of this decision are of special significance to the matter now before the Court.

First, the interest of the purchaser under a retail installment sales contract in the goods he has purchased, *i.e.*, possession subject to a security interest, is a property interest protected by the fourteenth amendment. 407 *U. S.* at 86–87, 92 S. Ct. 1983.

Second, even temporary deprivation of the use of property is within the purview of that amendment. 407 *U. S.* at 84–86, 92 S. Ct. 1983.

Third, the character of the goods in question, whether "necessary," or merely "important," or even "mere luxuries," while arguably relevant to the form of notice and hearing required, is not relevant to the existence or not of a due process right to some form of prior notice and hearing. 407 *U. S.* at 89–90, 92 S. Ct. 1983.

Fourth, the fourteenth amendment requires notice and hearing at a time when the deprivation of property can be prevented; remedies after the fact cannot wholly undo a wrongful deprivation of property. 407 *U. S.* at 80–82, 92 S. Ct. 1983.

Fifth, while there are undoubtedly extraordinary circumstances in which a creditor may be entitled to seize goods sold under a retail installment sales contract to prevent destruction of the goods or their concealment or removal from the jurisdiction, such circumstances must be "truly unusual'; the mere fact that the secured debtor is in default is not sufficient to justify taking without prior notice and hearing. 407 *U. S.* at 90–93, 92 S. Ct. 1983.

Finally, the fact that any particular debtor from whom goods are seized has no defense does not justify denying him the opportunity to be heard. The right to a hearing does not depend on an advance showing that one is likely to prevail. The fact that right to possession is in dispute suffices to trigger the right to a hearing. 407 *U. S.* at 87, 92 S. Ct. 1983.

The principles set out in *Fuentes* would clearly require prior notice and hearing on the facts of the present case. The interests of the parties are indistinguishable from those in *Fuentes,* and even the constitutionally inadequate procedural protections provided by the Florida and Pennsylvania replevin statutes — the requirements of posting a bond, filing of a *pro forma* affidavit setting out the fact of right to possession and the provision of a post-seizure hearing at the instance of the debtor — are absent.

*Fuentes* is not an aberrational case. It is one of a long line of cases requiring notice and hearing prior to deprivation of property rights. *Bell v. Burson,* 402 *U. S.* 535, 542, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971); *Wisconsin v. Constantineau,* 400 *U. S.* 433, 437, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971); *Goldberg v. Kelly,* 397 *U. S.* 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970); *Armstrong v. Manzo,* 380 *U. S.* 545, 548, 551, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965); *Mullane v. Central Hanover Bank & Trust Co.,* 339 *U. S.* 306, 313, 70 S. Ct. 652, 94 L. Ed. 865 (1950); *Opp Cotton Mills v. Administrator,* 312 *U. S.* 126, 152–153, 61 S. Ct. 524, 85 L. Ed. 624 (1941); *United States v. Illinois Central R. Co.,* 291 *U. S.* 457, 463, 54 S. Ct. 471, 78 L. Ed. 909 (1934); *Londoner v. Denver,* 210 *U. S.* 373, 385–386, 28 S. Ct. 708, 52 L. Ed. 1103 (1908).

The majority suggests two grounds for not treating *Fuentes* as dispositive of this case. The first is the contention that *Mitchell v. W.T. Grant,* 416 *U. S.* 600, 94 S. Ct. 1895, 40 *L. Ed.* 2d 406 (1974) has fatally undermined the principles set out in *Fuentes. Ante* at 165 n. 2. It is beyond doubt that in *Mitchell* the Supreme Court has limited the expansive scope of *Fuentes.* Nevertheless, *Mitchell* did not overrule Fuentes and specifically noted that the vast majority of lower court cases following *Fuentes* in overturning replevin and similar statutes were soundly decided. 416 *U. S.* at 620 n. 14, 94 S. Ct. at 1906, 40 *L. Ed.* 2d at 421 n. 14; *cf.* 416 *U. S.* at 623, 94 S. Ct. at 1908, 40 *L. Ed.* 2d at 423–425 (Powell,

J., concurring).[5] The *Mitchell* court distinguished the Louisiana sequestration statute there under attack from the Pennsylvania and Florida statutes overturned in *Fuentes* on a number of significant grounds: (1) the debtor's property could not be seized on a bare allegation of right to possession by the creditor — specific facts showing default and the existence of a vendor's lien entitling the creditor to possession had to be set out in a verified petition; (2) the writ of sequestration had to be issued by a judge rather than a mere clerk; it was, as the Court said, under "judicial control . . . from beginning to end"; (3) the Louisiana statute expressly provided for a speedy hearing at the instance of the debtor for vacation of the writ and for award of damages and attorneys' fees against the creditor if the writ was vacated on the debtor's motion; and (4) unlike the Pennsylvania and Florida procedures in which, absent affirmative action by the debtor, no final adjudication need ever be made as to the right of the creditor to possession, the Louisiana statute was specifically a remedy *pendente lite,* and must inevitably be followed by a hearing on the merits of the creditor's claim.

Plainly, none of the procedural factors that saved the Louisiana statute is present in this case.

The second argument is that self-help repossession fails to meet the threshold requirement for the invocation of the fourteenth amendment — the presence of "state action." The overwhelming majority of the numerous courts which, since 1972, have dealt with the constitutionality of self-help repossession have found the due process guarantees inapplicable to self-help repossession on this ground. *E.g., Adams v. Southern California First Nat'l. Bank,* 492 *F.* 2d 324 (9 Cir. 1973), *cert.* den. —— *U. S.* ——, 95 S. Ct. 325, 42 L. Ed. 2d

---

[5]In fact, this Court, subsequent to the decision in *Mitchell*, struck down the New Jersey replevin statute, *N. J. S. A.* 2A:59–1 *et seq.*, relying on *Fuentes. Singer Co. v. Gardner*, 65 *N. J.* 403, 415 (1974). *See also Sugar v. Curtis Circulation Co.*, 383 *F. Supp.* 643 (S. D. N. Y. 1974) ; *Garcia v. Krausse*, 380 *F. Supp.* 1254 (D. Tex. 1974).

282 (1974) ; *James v. Pinnix,* 495 *F.* 2d 206 (5 Cir. 1974) ; *Brown v. U. S. Nat'l. Bank of Oregon,* 96 *Or.* Adv. Sheet 1667, 509 *P.* 2d 442 (Or. Sup. Ct. 1973). It should be noted, however, that the existence of state action is to a considerable degree a factual question and must be decided on the facts of each case. *Burton v. Wilmington Parking Authority,* 365 *U. S.* 715, 725–726, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961). Thus decisions based on the particular statutory schemes and trade customs found in other jurisdictions do not necessarily compel like decisions in this State. Indeed, courts in a number of jurisdictions have identified local conditions which justify a finding of state action in self-help repossession, *e.g., Boland v. Essex Cty. Bank & Trust Co.,* 361 *F.* Supp. 917 (D. Mass. 1973) ; *Michel v. Rex-Noreco, Inc.,* 12 *U.C.C. Rep.* 543 (U. S. Dist. Ct. D. Vt. 1972) ; *cf. Adams v. Southern California First Nat'l. Bank,* 492 *F.* 2d 324, 338 (9 Cir. 1973) (Byrne, Jr., dissenting and, in a separate opinion. Hufstedler, J., dissenting from denial of rehearing *en banc*).

In *Burton v. Wilmington Parking Authority,* the United States Supreme Court found state action for purposes of the fourteenth amendment where "[t]he State has so far insinuated itself into a position of interdependence with [a private party] that it must be recognized as a joint participant in the challenged activity * * *." *Supra,* 365 *U. S.* at 725, 81 S. Ct. at 862. *Accord, United States v. Price,* 383 *U. S.* 787, 86 S. Ct. 1152, 16 L. Ed. 2d 267 (1966) ; *Reitman v. Mulkey,* 387 *U. S.* 369, 87 S. Ct. 1627, 18 L. Ed. 2d 830 (1967) ; *McQueen v. Druker,* 438 *F.* 2d 781 (1 Cir. 1971) ; *Palmer v. Columbia Gas Co.,* 479 *F.* 2d 153 (6 Cir. 1973).

In *Lucas v. Wisconsin Electric Power Co.,* 466 *F.* 2d 638 (7 Cir. 1972), *cert.* den. 409 *U. S.* 1114, 93 S. Ct. 928, 34 L. Ed. 2d 696 (1973), the U. S. Court of Appeals elaborated this admittedly vague standard:

We believe that affirmative support [of the state] must be significant, measured either by its contribution to the effectiveness of de-

fendant's conduct, or perhaps, by its defiance of conflicting national policy * * *. [466 *F.* 2d at 656].

This formulation was expressly approved by the majority in *Adams, supra,* 492 F. 2d at 335.

The role played by the State in self-help repossession has been discussed above. The State substantially regulates the use of retail installment sales contracts by automobile dealers and financers. It has placed its imprimatur on the use of self-help repossession by its adoption of *N. J. S. A.* 12A:9–503.[6]

[6]The majority, in its effort to demonstrate the "neutrality" of *N. J. S. A.* 12A:9–503, somewhat overstates the historical pedigree of self-help repossession. It would appear that prior to the adoption of the Uniform Conditional Sales Act, *L.* 1919, *c.* 210, § 16, which was superseded in 1963 by *N. J. S. A.* 12A:9–503, the permissibility of self-help repossession was uncertain. The earliest New Jersey case specifically recognizing a right to engage in self-help repossession appears to be *General Electric Contracts Corp. v. Band,* 14 *N. J. Misc.* 702, 186 *A.* 684 (Sup. Ct. 1936), although there are a number of earlier cases, which do not clearly distinguish between judicial and nonjudicial seizure, that might be read as authorizing self-help repossession, *e. g., Cole v. Berry,* 42 *N. J. L.* 308 (Sup. Ct. 1880).

In the early nineteenth century, nonpossessory liens on chattels were highly disfavored in the United States. 1 *Coogan, Hogan & Vagts, Secured Transactions under the U. C. C.,* § 1.03 n. 19 (1973). By the end of the nineteenth century most jurisdictions permitted self-help repossession where provided for by contract, *see* Annotation, "Right of conditional seller to retake property without judicial aid," 55 *A. L. R.* 184 (1927), but jurisdictions were split on whether the conditional seller could use self-help repossession when the contract did not expressly provide for it. *Compare Blackford v. Neaves,* 23 *Ariz.* 501, 205 *P.* 587 (1922) (permitting self-help repossession) *with McLeod v. Jones,* 105 *Mass.* 403 (Mass. Sup. Jud. Ct. 1870) (not permitting self-help repossession).

The majority's references to early English common law are inapposite. As financing devices, the chattel mortgage and conditional sale with their conceptual paraphernalia of nonpossessory liens and divided interests in property were essentially inventions of the late nineteenth century. Gilmore & Alexrod, "Chattel Security," 57 *Yale L. J.* 517, 528–529 (1948) (Earlier analogues can be identified but Prof. Gilmore characterizes them as "queasy" devices and their history as "obscure, filled with doubt," *id.* at 529 n. 28). It is anachronistic to read Blackstone's comments about the rights of prop-

*Cf. Singer Co. v. Gardner,* 65 *N. J.* 403, 413–414 (1974). Through its police practices it has facilitated the physical re-taking of the goods. Most important, by making special pro-vision for transfer of title of repossessed cars, the State has affirmatively acted to enable secured creditors to achieve the ultimate ends of self-help repossession — resale of the re-possessed goods to compensate the secured party for his losses caused by the debtor's default — which would otherwise be unattainable.

### III

The Court, however, need not rely on the due process clause of the federal constitution to decide this case. Plaintiff urges as an alternate ground for decision Art. I, par. I of the New Jersey Constitution of 1947.

This provision, which is a verbatim reenactment of Art. I, par. I of the Constitution of 1844, has consistently been con-strued to protect citizens against deprivation of property without due process of law. *E.g., Penn-Reading Seashore Lines v. Bd. of Public Utility Commissioners,* 5 *N. J.* 114, 124–126 (1950), *cert.* den. 340 *U. S.* 876, 71 S. Ct. 122, 95 S. Ct. 637 (1950); *Maxwell v. Goetschius,* 40 *N. J. L.* 383, 391 (Sup. Ct. 1878). It substantially encompasses those rights also protected by the due process and equal protection clauses of the federal constitution. *Washington Nat'l. Ins. Co. v. Bd. of Review,* 1 *N. J.* 545 (1949), but, as this Court

---

erty owners against thieves and converting bailees as referring to security devices which were, as of yet, uninvented.

At the very least, the effect of the adoption of the Uniform Condi-tional Sales Act was to render certain a remedy whose validity had previously been uncertain and to give shelter to a creditor who sought to use it.

Furthermore. I find it difficult to reconcile the allegation of legis-lative "neutrality" made by the majority with the recent case of *Singer Co. v. Gardner,* 65 *N. J.* 403, 414–415 (1974), in which the Court laid particular stress on the respect which is to be paid to commercial practices which the Legislature has "sanctioned" by adop-tion of provisions of the U. C. C. permitting them.

recognized in *Robinson v. Cahill,* 62 *N. J.* 473, 491–493 (1973), the protection it provides is by no means limited to that provided by the federal constitution. In construing Art. I, par. I, this court may adopt, *e.g., State Bd. of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504, 518 (E. & A. 1935), or reject, *e.g., Robinson v. Cahill, supra,* the construction placed by the federal courts on the fourteenth amendment, as seems appropriate to local conditions.

The strict limitation on the application of the fourteenth amendment to cases involving state action derives primarily from a concern for preserving the delicate balance of the American federal system. There is an everpresent peril that an overexpansive reading of the federal constitution will excessively restrict the power and opportunity of the several states to cope with their own problems in the light of their own circumstances. In the *Civil Rights Cases,* 109 *U. S.* 3, 3 S. Ct. 18, 27 L. Ed. 2d 835 (1883), the case in which the United States Supreme Court first enunciated the constitutional doctrine that the fourteenth amendment does not extend to purely private action, the Court declared:

And so in the present case, until some state law has been passed, or some state action through its officers or agents has been taken, adverse to the rights of citizens sought to be protected by the fourteenth amendment, no legislation of the United States under said amendment, nor any proceeding under such legislation, can be called into activity, for the prohibitions of the amendment are against state laws and acts done under state authority. Of course, legislation may and should be provided in advance to meet the exigency when it arises; but it should be adapted to the mischief and wrong which the amendment was intended to provide against; and that is, state laws, or state action of some kind, adverse to the rights of the citizen secured by the amendment. Such legislation cannot properly cover the whole domain of rights appertaining to life, liberty, and property, defining them and providing for their vindication. That would be to establish a code of municipal law regulative of all private rights between man and man in society. It would be to make congress take the place of the state legislatures and to supersede them. [109 *U. S.* at 13, 3 S. Ct. at 23].

This Court, in its construction of *N. J. Const.* (1947), Art. I, par. I, is not constrained by considerations of federalism,

*Robinson v. Cahill, supra,* 62 *N. J.* at 490, and need not impose so rigorous a requirement of state action. Even were the facts in this case insufficient to support a finding of state action for purposes of the federal due process clause, they are ample to establish state action for purposes of *N. J. Const.* (1947), Art. I, par. I.

Indeed, it should be noted that unlike the fourteenth amendment, which declares: "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law * * *," *N. J. Const.* (1947), Art. I, par. I is not by its terms limited to prohibitions against state action:

> 1. All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

Other sections of Article I of the Constitution of 1947 not expressly directed against state action have been held to protect citizens against encroachments against their rights by wholly private conduct. *Cooper v. Nutley Printing Co.,* 36 *N. J.* 189, 196–197 (1961) (*N. J. Const.* (1947), Art. I, par. 19); *Gray v. Serruto Builders, Inc.,* 110 *N. J. Super.* 297, 306–307 (Ch. Div. 1970) (alt. holding, *N. J. Const.* (1947), Art. I, par. 5).

A number of scholarly commentators have emphasized that one of the most important functions performed by state constitutional bills of rights which is not performed by the federal constitution is the protection of citizens against private oppression as well as oppression by the state, Countryman, "The Role of a Bill of Rights in a Modern State Constitution," 45 *Wash. L. Rev.* 453, 473 (1970); Note, "Toward an Activist Role for State Bill of Rights," 8 *Harv. Civ. Rights-Civ. Lib. L. Rev.* 271 (1973), and have recognized that the New Jersey Constitution presents special opportunities for this construction. Note, "Toward an Activist Role for Bill of Rights," 8 *Harv. Civ. Rights-Civ. Lib. L. Rev.* 271, 338 (1973) (*N. J. Const.* (1947), Art. I, par. I); Note, "The

New Jersey Housing Anti-Bias Law: Applicability to Non-State Aided Developments," 12 *Rutgers L. Rev.* 557, 567–68 (1958) (*N. J. Const.* (1947), Art. I, par. 5).

New Jersey courts have long found support for intervention to prevent purely private interference with property rights in *N. J. Const.* (1947), Art. I, par. I. *Cameron v. Theatrical Stage Employees, Local 384*, 118 *N. J. Eq.* 11 (E. & A. 1934); *Hilton v. Hilton*, 89 *N. J. Eq.* 182 (E. & A. 1918); *Brennan v. United Hatters, Local 17*, 73 *N. J. L.* 729 (E. & A. 1906); *Bednarik v. Bednarik*, 18 *N. J. Misc.* 633 (Ch. 1940), overruled on other grounds, *Cortese v. Cortese*, 10 *N. J. Super.* 152 (App. Div. 1952); *Collins v. International Alliance of Stage Employees*, 119 *N. J. Eq.* 230 (Ch. 1935); *Reardon Laundry Co. v. Reardon*, 2 *N. J. Misc.* 550, 128 *A.* 482 (Ch. 1925), aff'd 97 *N. J. Eq.* 356 (E. & A. 1925); *Bloom v. Koch*, 63 *N. J. Eq.* 10, 20–21 (Ch. 1902); *Beach v. Sterling Iron & Zinc Co.*, 54 *N. J. Eq.* 65 (Ch. 1895). The application of the prohibition of Art. I, par. I to private oppressive conduct has received both recent reaffirmation by the lower courts, *Gray v. Serruto Builders, Inc.*, 110 *N. J. Super.* 297, 306–307 (Ch. Div. 1970) (alt. holding), and praise of commentators. Note, "Towards an Activist Role for State Bill of Rights," 8 *Harv. Civ. Rights-Civ. Lib. L. Rev.* 271, 338 (1973). Thus viewed, *N. J. Const.* (1947), Art. I, par. I protects persons against deprivation of property without due process of law even when the deprivation is solely the result of private conduct.

It is immaterial to this case whether the inalienable rights provision of the Constitution of 1947 is construed to involve merely a relaxed state action requirement or no requirement at all of state action. On either construction, plaintiff is entitled to protection against deprivation of property by defendant without due process of law.

The procedural requirements of "due process" necessarily vary from case to case. *Lopez v. N. J. Bell Telephone Co.*, 51 *N. J.* 362, 373 (1951); *Avant Industries, Ltd. v. Kelly*, 127 *N. J. Super.* 550, 553 (App. Div. 1974); *Goldberg v. Kelly*,

397 *U. S.* 254, 262–263, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1971) ; *Morrissey v. Brewer,* 408 *U. S.* 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). The precise requirements in any given type of case depend upon a balance struck between the interests of the parties concerned. *Morrissey v. Brewer, supra* at 481, 92 S. Ct. 2593. *Cafeteria & Restaurant Workers Union v. McElroy,* 367 *U. S.* 886, 895, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961).

Few cases have actually reached the question of the requirement of due process in the context of self-help repossession. *See, e. g., Messenger v. Sandy Motors, Inc.,* 121 *N. J. Super.* 1 (Ch. Div. 1972). The primary interest asserted by the creditor is the need for a speedy remedy to prevent destruction, concealment, reconveyance, or removal from the jurisdiction of the automobile by the defaulting debtor. Against this interest must be balanced the interest of the debtor in not being deprived of what may well be an essential piece of personal property without an opportunity to show that the creditor is not entitled to immediate possession. These are precisely the interests involved in *Fuentes* and I would adopt the balance drawn by the United States Supreme Court in that case. The debtor is entitled to remain undisturbed in his possession unless the creditor notifies him prior to seizing the goods and demonstrates at a suitable preseizure hearing that he is likely to be able to prove that he is entitled to immediate possession. I would permit the secured creditor to act *ex parte* only in the extraordinary event that he can demonstrate the danger of immediate and irreparable damage. Such a procedure is expressly provided by *R.* 4:61, as recently revised. *Cf. Singer Co. v. Gardner,* 65 *N. J.* 403, 415 (1974).[7]

---

[7]As indicated above, *Mitchell v. W. T. Grant Co.,* 416 *U. S.* 600, 94 S. Ct. 1895, 40 *L. Ed.* 2d 406 (1974) does not impair the holding of *Fuentes* as applied to self-help repossession, in which no due process rights are provided. I note, however, that in construing the Constitution of 1947 we are not bound to adopt retrogressive decisions of

It is not contended that debtors routinely attempt to conceal, dispose of or destroy automobiles when threatened with repossession. Indeed, in *Messenger,* the court noted that a significant number of debtors voluntarily surrender their cars on demand by the creditor. 121 *N. J. Super.* at 11.

On the other hand, in a significant number of cases where the creditor claims default by failure to make installment payments — the most common reason for repossession although by no means the only one — the debtor may be able to assert nonfrivolous defenses. In some small number of cases the creditor is simply overreaching. *See* Project, "Resort to the Legal Process in Collecting Debts from High Risk Credit Buyers in Los Angeles — Alternate Methods for Allocating Present Costs," 14 *U. C. L. A. L. Rev.* 879, 898–901 (1967) for empirical evidence of this practice. In a larger number of cases, the claim of default is the result of mistake — computer billing error, payments lost or delayed in mail, etc. In a substantial number of cases, the creditor and the purchaser are involved in a bona fide dispute. *N. J. S. A.* 12A:2–717 expressly permits the purchaser to deduct damages resulting from the seller's breach of the contract of sale from his payments.[8] A recent study of defaulting debtors indicates that about a third claim some reason for ceasing payments which implicates the seller — principally fraud or misrepresentation of the goods. *Caplovitz, Debtors in Default,* 4–12, 6–1 to 6–70 (1971). Even if in a large percentage of these cases, defenses prove on closer examination to be insubstantial, there still remain a significant number of cases in which the purchaser has bona fide objections which go unheard when a creditor engages in self-help repossession. *See generally,*

the United States Supreme Court. I would, in construing *N. J. Const.* (1947), Art. I, par. I, adopt the sound and wise principles of *Fuentes* unencumbered by any limitations which have been imposed upon them by *Mitchell.*

[8] The consumer cannot be deprived of this right either by negotiation of his promissory note, *N. J. S. A.* 17:16C–38.2 *et seq.,* or by inclusion in the retail installment sales contract of a "waiver-of-defenses" clause. *Unico v. Owens,* 50 *N. J.* 101 (1967).

Neth, "Repossession of Consumer Goods: Due Process for the Consumer: What's Due the Creditor," 24 *Case W. Res. L. Rev.* 7, 33–34 (1972). So long as there is a reasonable prospect that some debtors will be able to make out defenses, retail installment buyers as a class are entitled to a prerepossession hearing. As was aptly said in *Fuentes v. Shevin,* 407 *U. S.* 67, 87, 92 S. Ct. 1983, 1997–1998, 32 L. Ed. 2d 556:

> * * * The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing. "To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same results because he had no adequate defense upon the merits." Coe. v. Armour Fertilizer Works, 237 US 413, 424, 35 S Ct 625, 629, 59 L Ed 1027, 1032. It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing on the contractual right to continued possession and use of the goods. [407 *U. S.* at 87, 92 S. Ct. at 1997–1998].

The trial judge in *Messenger v. Sandy Motors, Inc.,* 121 *N. J. Super.* 1 (Ch. Div. 1972) and the majority here have treated such factors as the administrative convenience of creditors, the possible burden on the courts, and the effects of requiring conformity to due process standards on the cost and availability of consumer credit as being of significance in weighing the due process rights in this case. *Ante* at 173 n. 8. None of these is a legitimate consideration.

The concept of procedural due process, is, by its very nature, designed to prevent the virtues of administrative convenience, speed and efficiency from trampling under the rights of citizens. *Stanley v. Illinois,* 405 *U. S.* 645, 656–657, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). To require that forms be observed and rights respected is necessarily to demand that some parties abide a quantum of delay, inefficiency and inconvenience. To hold that a showing of delay, inefficiency and inconvenience suffices to defeat a claim to procedural due process is, in effect, to expunge the concept of due process from our constitutional law.

This Court has often heard the argument that innovations in the law will "open the flood gates" to litigation. While the heavy caseload in our trial courts is properly a matter of concern, we have consistently refused to permit this type of argument to stand in the way of innovative decision. As we said in *Falzone v. Busch,* 45 *N. J.* 559 (1965) : "* * * [T]he fear of an expansion of litigation should not deter the courts from granting relief in meritorious cases; the proper remedy is an expansion of the judicial machinery, not a decrease in the availability of justice." 45 *N. J.* at 567.

As to the contention that requiring secured creditors to conform to minimal due process standards will affect the cost and availability of consumer credit to the detriment of the persons sought to be benefited by this reform, the short answer is that even if this were true, it is not a relevant consideration in the evaluation of constitutional rights. In this case, however, one may plausibly question whether the tears shed by the secured creditors for the consumer are not really crocodile tears. The economic relationship between the availability of creditor remedies and the cost and availability of consumer credit is extremely complex. *See, e. g.,* Note, "Case Study of the Impact of Consumer Legislation: the Elimination of Negotiability and the Cooling-Off Period," 78 *Yale L. J.* 618 (1969). The claim that the net effect of imposing minimal due process requirements on repossession will be to increase the cost of consumer credit and make.it less available to low income consumers has been substantially challenged on theoretical economic grounds, Wallace, "The Logic of Consumer Credit Reform," 82 *Yale L. J.* 461 (1973), and an early survey has at least cast doubt on the claim as a factual matter, Krahmer, Clifford & Lasley, "Fuentes v. Shevin and the Consumer: a Legal and Empirical Study," 4 *Texas Tech. L. Rev.* 23, 60–61 (1972).

IV

As a third ground for decision, I would hold that retail installment sales contracts for automobiles sold as consumer

goods (as the term is defined in *N. J. S. A.* 12A:9–109(1)), which expressly or impliedly permit repossession without prior notice and hearing are to that extent unconscionable.[9]

Despite the growing body of case law in this jurisdiction and elsewhere applying the principles of unconscionability, the law in this area remains, and perhaps must necessarily be, unconfined by well-defined and unvarying doctrines. Each type of commercial practice presented to the courts must be dealt with on its own facts and in light of its own peculiar commercial context.

Like *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960), this case concerns the terms of standardized contracts offered by the automobile industry. We may take judicial notice of the fact that retail installment sales contracts offered by automobile dealers invariably contain self-help repossession clauses and that no individual consumer has the bargaining power to force insertion of hearing and notice terms into those repossession provisions. The buyer must accept the terms as offered in the dealer's form contract or not buy the goods at all. Even the latter course may not be open to him if he is one of the many people in New Jersey for whom ownership of an automobile is a practical necessity.

The fact that the parties are of grossly unequal bargaining power and the terms of the contract are, in effect, dictated by the seller in his preprinted forms does not grant the judiciary a roving commission to rewrite contracts between the parties. It is clear, however, that this fact is one which justifies close judicial scrutiny of contractual provisions.

---

[9] *N. J. S. A.* 12A:2–302 is, by its terms, limited to transactions governed by Article 2 of the U. C. C. It is well established, however, that transactions under Article 9 which are incidental to sales are also covered. 1 *Anderson, Uniform Commercial Code* (2 ed 1970), § 2–302:6 at 396; *see Urdang v. Muse,* 114 *N. J. Super.* 372 (Essex Cty. Dist. Ct. 1971). In any case, the inherent power of this Court to declare contracts unconscionable would permit us to apply unconscionability doctrines to this transaction. *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960); *Ellsworth Dobbs, Inc. v. Johnson,* 50 *N. J.* 528, 553–555 (1967).

*Henningsen v. Bloomfield Motors, Inc., supra; Unico v. Owens*, 50 *N. J.* 101, 111–112 (1967); *Ellsworth Dobbs, Inc. v. Johnson*, 50 *N. J.* 528, 553–55 (1967); *Shell Oil Co. v. Marinello*, 63 *N. J.* 402, 407–09 (1973). Close scrutiny is doubly justified when the contractual term in question is one that expands the remedies of the merchant or contracts those of the consumer. *Henningsen v. Bloomfield Motors, Inc., supra* (disclaimer of warranty); *Unico v. Owens, supra* (waiver of defenses); *Shell Oil Co. v. Marinello, supra* (unilateral termination of franchise agreement); *cf. Collins v. Uniroyal, Inc.*, 64 *N. J.* 260 (1974) (disclaimer of liability for consequential damages). *See generally, White & Summers, Uniform Commercial Code*, § 4–6 at 125–28 (1972).[10]

In such a case, the proper question for the Court to ask is: Is this a remedial provision which a reasonable consumer would have accepted had he had the bargaining power and the commercial sophistication, to negotiate with the seller on a reasonably even basis? There is, needless to say, a wide range of terms which reasonable consumers might be willing to accept in return for the consideration which the seller has in fact offered. This standard does not require that the merchant offer the consumer the most favorable possible terms. All that the principles of unconscionability require is that the terms be within the range of acceptability to a reasonable consumer.

Self-help repossession, without prior notice and without a prior opportunity to present defenses to an impartial third party, I submit, is not within that range. The effect of the contract term at issue here is to put the consumer wholly at the mercy of the secured creditor. The secured party may seize the goods based upon a secret and unexpressed allegation of default. The debtor cannot dispute the secured party's

---

[10]It is not suggested by plaintiff in this case that he did not understand the repossession clause. It should be noted, however, that consumers very commonly do not understand such terms. *Caplovitz, Debtors in Default*, 10–33 to 10–39 (1971).

claims except by complex and time consuming suit for conversion or for recovery of the goods. Incidental to putting his continued possession at the mercy of the creditor, the debtor, in effect, gives up his right to deduct damages from his installment payments under *N. J. S. A.* 12A:2–717 and thereby limits his own affirmative remedies against breach by the seller. The self-help repossession provision is not dissimilar in its practical effect on the debtor to the unilateral termination provisions in franchise agreements which this Court condemned in *Shell Oil Co. v. Marinello, supra.*

The affirmative sanction by the Legislature of self-help repossession must be given due weight in determining unconscionability. *Singer Co. v. Gardner,* 65 *N. J.* 403, 413–414 (1974). At an early stage in the drafting process, the creators of the Uniform Commercial Code made a conscious decision not to deal with the concededly special problems of consumers but to write a single unified law applicable to all commercial transactions. 1 *Coogan, Hogan & Vagts, Secured Transactions in the U.C.C.,* § 5.07[a] at 390. They recognized that this decision had particularly harsh consequences for consumers as it affected the drafting of Article 9. Indeed, the Official Comment to *U.C.C.* 9–101 specifically states:

Consumer instalment sales and consumer loans present special problems of a nature whih makes special regulation of them inappropriate in a general commercial codification. Many states now regulate such loans and sales under small loan acts, retail instalment selling acts and the like. While this Article applies generally to security interests in consumer goods, it is not designed to supersede such regulatory legislation (see Notes to Section 9–102 and 9–203). Nor is this Article designed as a substitute for small loan acts or retail instalment selling acts in any state which does not presently have such legislation.

As applied to consumer transactions, the existence of *N. J. S. A.* 12A:9–503 need not, therefore, be given great weight in evaluating the unconscionability of self-help repossession.

The position suggested here is concededly a novel one. It has been adopted by a trial court in this jurisdiction. *Grossman Furniture Co. v. Pierre,* 119 *N. J. Super.* 411 (Essex Cty. Dist. Ct. 1972) ; *cf. Kosches v. Nichols,* 68 *Misc.* 2d 795, 327 *N.Y.S.* 2d 968 (N.Y. Civ. Ct. 1971). Appellate courts in two jurisdictions have held failure to provide notice of intention to repossess consumer goods prior to engaging in self-help repossession to be unconscionable. *Fontaine v. Industrial Nat'l. Bank, R.I.* 298 *A.* 2d 521 (R.I. Sup. Ct. 1973) ; *Ford Motor Credit Co. v. Waters,* 273 *So.* 2d 96 (Fla. Dist. Ct. App. 1973). Two other jurisdictions have reached the same result by barring all repossessions in which the creditor has not affirmatively shown express consent by the debtor. *Carey v. Interstate Bond & Mortgage Co.,* 4 *Wash.* 2d 632, 104 *P.* 2d 579 (Wash. Sup. Ct. 1940) ; *Price v. General Motors Acceptance Corp.,* 95 *So.* 2d 834 (La. App. Ct. 1957).[11] The position taken here has also been urged by a respected scholar in the field of commercial law. Ellinghaus, "In Defense of Unconscionability," 78 *Yale L.J.* 757, 804–805, 809–12 (1969).

## V

Since I would reverse on grounds of the illegality of the exercise of self-help repossession, I would not reach the issue of the possible unconscionability of the acceleration clause. It is of interest that after plaintiff commenced this litigation, the bank, in effect, waived its exercise of the acceleration clause. That it could so readily do this raises questions in my mind as to the justifiability of the original invocation of the remedy. *Cf. Urdang v. Muse,* 114 *N. J. Super.* 372 (Essex Cty. Dist. Ct. 1971). On my view, however, that is a matter for another day.

---

[11]*Carey* is pre-Code but has not been overruled and appears to be good law. *Price* is in a non-Code jurisdiction but one whose law governing repossession otherwise appears to resemble Article 9. *See generally, White & Summers, Uniform Commercial Code,* § 26–6 at 972 n. 62 (1972).

## VI

Where a commercial practice is of wide use and long standing and is supported by the great weight of judicial authority, there is a temptation for us to relax our vigilance. It is temptation we must resist, for the sad truth is that many forms of oppressive commercial practice come garbed in respectability and official approval. I am firmly persuaded that self-help repossession is just such a practice.

I would reverse and remand.

CLIFFORD, J., concurs in the result.

*For affirmance*—Chief Justice HUGHES and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN and CLIFFORD—5.

*For reversal and remandment*—Justice PASHMAN.